**IN THE U.S. DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| **SECURITIES AND EXCHANGE** | : | |
| **COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **V.** | : | **Civil Action No.** |
| | : | |
| **THOMAS W. AVENT, Jr.,** | : | |
| **RAYMOND J. PIRRELLO, Jr., and** | : | |
| **LAWRENCE J. PENNA,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the

"Commission" or "SEC"), alleges:

## SUMMARY

1.      Defendant Thomas W. Avent, Jr. is a tax partner with one of the

world's largest accounting firms.  Avent lives and works in Atlanta.  He leads a

practice group that performs due diligence in connection with upcoming

mergers and acquisitions.  Through his work, Avent learns secret, proprietary,

carefully guarded information about upcoming corporate acquisitions, including

tender offers for publicly-traded companies—some of the most valuable,

sensitive, nonpublic information that exists within the sphere of the stock markets.

2.     In 2011 and 2012, Avent tipped his stock broker, Defendant Raymond J. Pirrello, Jr., about upcoming acquisitions three separate times.

3.     Pirrello, in turn, passed the three tips on to his former colleague and long-time friend, Defendant Lawrence Penna.  Penna then arranged to buy stocks or call options of all three target companies before the acquisitions were announced to the public.  As a result, Penna got an illegal jump on other investors, and he and his family made over $111,000 in illicit insider-trading profits.

4.     Pirrello compounded his misconduct by using the material nonpublic information he illegally received from Avent to recommend the three target companies to additional associates, who then used the information to buy securities of the targets before the acquisitions were announced.

5.     Avent and Pirrello, and separately Pirrello and Penna, communicated frequently by telephone, email, and text messages throughout 2011 and 2012.

6.     The Defendants exchanged text messages about some of their illegal trades.  In one such exchange, Pirrello asked, "How many did we get?"  Penna

answered, "2500." Pirrello responded, "We should make 25K." To which Penna replied, "Only Bgt Stock – should I go back for more?" Later, after the public announcement, Penna texted Pirrello, "A little over 15k. Not too bad. :)"

7.      In another example, Avent and Pirrello exchanged a series of text messages after the public announcement of an acquisition that Avent had earlier disclosed to Pirrello. After the announcement, Avent texted Pirrello, "Happy?" Pirrello responded, "Price bad." To which Avent replied, "Whatever."

8.      More than text messages flowed between Avent and Pirrello. Avent provided material nonpublic information to Pirrello, and Pirrello provided pecuniary and other benefits to Avent. While the illegal tips and insider trading were occurring, Pirrello paid Avent $50,000 in cash, Pirrello provided Avent investment advice and serviced his brokerage account, and Pirrello arranged for another one of his brokerage customers to buy an illiquid $250,000 investment that Avent wanted to sell.

9.      In a similar vein, Pirrello provided material nonpublic information to Penna and Penna provided pecuniary benefits to Pirrello. Within two weeks after one of the acquisition announcements, Penna paid $7,000 towards Pirrello's American Express ("AMEX") credit card bill. One week after another announcement, Penna paid $14,500 towards Pirrello's AMEX bill.

10. Through their conduct, Avent, Pirrello, and Penna engaged in fraudulent insider trading.

11. Defendants Avent and Pirrello, directly and indirectly, have engaged in and, unless enjoined, will continue to engage in transactions, acts, practices, and courses of business which violate Sections 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

12. Defendants Avent, Pirrello, and Penna, directly and indirectly, have engaged in and, unless enjoined, will continue to engage in transactions, acts, practices, and courses of business which violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## JURISDICTION AND VENUE

13. The SEC brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1] seeking permanent injunctions, disgorgement of trading profits, plus prejudgment interest, and civil penalties.

14. This Court has jurisdiction pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  The Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a

4

national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

15.    Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391(b), because acts, practices, transactions and courses of business constituting the alleged securities law violations occurred in substantial part within this district and because Defendant Avent resides in this district.

## DEFENDANTS

16.    **Thomas W. Avent Jr.,** age 63, is a resident of Atlanta, Georgia. Avent has been a partner in one of the world's largest accounting firms ("CPA Firm") since 1999.  Avent has been a licensed Certified Public Accountant ("CPA") in Mississippi since 1980 and in Georgia since 2003.  Avent is also an attorney.  He has been a member of the Mississippi bar since 1979, the Washington DC bar since 1984, and the New York bar since 1994.

17.    **Raymond J. Pirrello Jr.,** age 40, is a resident of Sparta, New Jersey. Pirrello has been in the securities industry since approximately 1996, and holds Series 7, 24, and 63 securities licenses.  Pirrello's Series 7 license qualifies him to work as a stock broker.  Pirrello's Series 24 license qualifies him to supervise other stock brokers.  At the time of the events described in this Complaint,

Pirrello worked for an SEC-registered securities broker-dealer located in Hackensack, New Jersey ("Securities Firm").  At the start of his career, Pirrello worked with Penna at another SEC-registered securities broker-dealer.

18.     **Lawrence J. Penna**, age 72, is a resident of Edgewater, New Jersey. Penna was employed in the securities industry from approximately 1970 through 1999, when he consented to an SEC order barring him from association with any broker-dealer and from participating in any penny stock offerings.  During his thirty-year career, Penna has owned and managed an SEC-registered securities broker-dealer.

## RELEVANT ENTITIES

19.     **Radiant Systems, Inc.** ("Radiant") was a Georgia corporation headquartered in Alpharetta, Georgia.  Its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. §78l(b)] and traded on the NASDAQ National Market System ("NASDAQ") under the symbol RADS, until approximately August 24, 2011, when Radiant was acquired by NCR Corporation.

20.     **NCR Corporation** (NCR) is a Maryland corporation headquartered in Duluth, Georgia.  Its common stock is registered with the Commission

pursuant to Section 12(b) of the Exchange Act [15 U.S.C. §78l(b)] and trades on the New York Stock Exchange ("NYSE") under the symbol NCR.

21.     **Midas Incorporated, Inc.** ("Midas") was a Delaware corporation headquartered in Itasca, Illinois.  Its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. §78l(b)] and traded on the NYSE under the symbol MDS, until approximately April 30, 2012, when Midas was acquired by TBC Corporation.

22.     **TBC Corporation** ("TBC") is a private Delaware corporation headquartered in Palm Beach Gardens, Florida.

23.     **BrightPoint, Inc.** ("BrightPoint") was an Indiana corporation headquartered in Indianapolis, Indiana.  Its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. §78l(b)] and traded on the NASDAQ under the symbol CELL, until approximately October 15, 2012, when BrightPoint was acquired by Ingram Micro Inc.

24.     **Ingram Micro Inc.** ("Ingram Micro") is a Delaware corporation headquartered in Santa Ana, California.  Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. §78l(b)] and trades on the NYSE under the symbol IM.

## FACTS

### A.    Avent's Work at CPA Firm

25.    For over fifteen years, Avent has been the Southeast Area Partner-in-Charge of CPA Firm's Mergers and Acquisitions Tax Practice.  Avent's practice group performs tax due diligence work on mergers and acquisitions for clients of CPA Firm.  Through his work, Avent is privy to material nonpublic information about upcoming acquisitions of public companies, including tender offers.

26.    Avent performed due diligence work for NCR in advance of the August 2011 tender offer by NCR for Radiant.

27.    Avent performed due diligence work for TBC in advance of the April 2012 tender offer by TBC for Midas.

28.    Avent performed due diligence work for Tech Data Corporation's ("Tech Data") planned acquisition of BrightPoint in advance of the October 2012 acquisition of BrightPoint by Ingram Micro.

29.    Avent had a duty of trust and confidence that included a duty not to disclose confidential information he learned during his CPA Firm engagements.  Avent knew that the information he learned through his due diligence work on mergers and acquisitions was confidential.

30.     At the time of the events described in this Complaint, Avent was subject to CPA Firm's Code of Conduct and to CPA Firm's Insider Trading Policy.  Avent knew that he was subject to CPA Firm's Code of Conduct and CPA Firm's Insider Trading Policy, and he understood both the Code of Conduct and the Insider Trading Policy.

31.     CPA Firm's Code of Conduct required that Avent "not disclose any confidential or private information to third parties," and "be alert to" "insider trading."

32.     CPA Firm's Insider Trading Policy prohibited him from disclosing material nonpublic information about planned acquisitions to people outside of CPA Firm.

**B.     Avent's Account with Pirrello**

33.     Avent opened an account with Securities Firm in approximately 2008.  Pirrello was Avent's stock broker on the account from the time when Avent first opened the account.  Avent knew that Pirrello had at least one other customer who invested in publicly traded companies.  Pirrello knew that Avent was a CPA and an attorney.  Pirrello also knew that Avent worked as CPA Firm's Southeast Area Partner-in-Charge of Mergers and Acquisitions.

34.     In his Securities Firm account opening forms, Avent stated that his investment objective was "Speculation" and that his "Focus is on generating highest potential growth and/or income with a willingness to assume the highest level of risk. *Very Aggressive.*"

35.     Pirrello gave Avent investment advice, and based on that advice Avent traded stocks and options, sometimes trading on margin.

36.     Avent made money on some of the trades he placed in his Securities Firm account. He lost money on other trades in that account. Avent expressed anger about one substantial loss in that account, and blamed Pirrello for it. Avent sent Pirrello several text messages and emails in which he demanded that Pirrello pay Avent over $500,000 to make up for the loss. Avent, however, continued to deposit more money into his account with Pirrello and to follow Pirrello's advice on new securities trades well into 2015.

37.     At the time of the events described in this Complaint, Pirrello was subject to Securities Firm's Written Supervisory Policies and Procedures and to Securities Firm's Insider Trading Policy. Pirrello knew that he was subject to Securities Firm's Written Supervisory Policies and Procedures and Securities Firm's Insider Trading Policy, and he understood both the Written Supervisory Policies and Procedures and the Insider Trading Policy.

38.    Securities Firm's Written Supervisory Policies and Procedures required "stringent avoidance of the misuse of inside information," which it defined as "material, nonpublic information," and went on to state that information is "likely to be material" if it relates to, among other things, "proposals or agreements involving a merger, acquisition, divestiture or leveraged buyout."  Securities Firm's Written Supervisory Policies and Procedures also required that Pirrello "refrain from trading on inside information."

39.    Securities Firm's Insider Trading Policy prohibited Pirrello from "buying, selling or recommending the purchase or sale of a security for any account while [he possessed] non-public material information relating to that security or its issuer."

### C.    Pirrello and Penna

40.    Pirrello has known Penna since Pirrello was a teenager.  Pirrello worked for Penna when Pirrello first entered the securities business.

41.    During the SEC investigation that led to this Complaint, Pirrello and Penna asserted their Fifth Amendment privilege against self-incrimination and refused to answer any questions about their advance knowledge of the acquisitions of Radiant, Midas, and BrightPoint; any questions about whether

11

they discussed those acquisitions; and any questions about whether they shared trading profits.

### D.   The Radiant Tender Offer

42.     In early May 2011, NCR contacted Radiant and expressed an interest in acquiring it.  On May 12, NCR sent a non-binding indication of interest to Radiant, including a proposed price range of $24 to $26 per share.  During the last week of May, NCR signed a nondisclosure agreement.  By June 21, NCR increased its offer to $28 per share.  From June 30 through July 11, NCR and Radiant, and their financial and business advisers, negotiated the terms of the planned transaction.

43.     In June 2011, NCR engaged CPA Firm to conduct tax due diligence relating to its planned tender offer for Radiant ("NCR Acquisition Engagement").  By June 23, Avent was working on the NCR Acquisition Engagement.  Between at least June 23 and July 11, 2011, Avent possessed material nonpublic information about NCR's planned tender offer for Radiant.  Through this engagement, Avent learned material nonpublic information in sufficient detail to permit him to perform the required tax due diligence.  In particular, by June 23, Avent knew that: 1) NCR's target was Radiant; 2) CPA Firm was in the process of commenting on the non-disclosure agreement; 3) due

diligence was to be completed in the next two weeks; and 4) NCR's goal was to finalize the acquisition agreement by July 11. On June 29, Avent received a portion of the merger agreement. On July 8, Avent received and approved CPA Firm's tax due diligence report for the NCR acquisition of Radiant.

44.     That very same day, Friday, July 8, Avent tipped Pirrello by sharing material nonpublic information about NCR's planned tender offer for Radiant with him. Pirrello then tipped the material nonpublic information to Penna, who in turn used that information by directing his son to purchase Radiant securities in a trust account held for Penna's benefit at a different securities broker-dealer than Pirrello's employer. Penna's son followed Penna's directions and purchased Radiant securities for Penna's trust account. At the same time, Penna's son also purchased Radiant securities in his own brokerage account and in the account of his mother (Penna's ex-wife).

45.     Specifically, on July 8, the following communications and securities transactions took place:

| | |
|---|---|
| 8:48 am (ET): | Avent called Pirrello - call lasted approximately 50 seconds |
| 8:50 am: | Pirrello called Avent - call lasted approximately 11 minutes, 20 seconds |

| | |
|---|---|
| 11:17 am - 12:01 pm: | 5 calls and 5 texts between Avent and Pirrello– the 5 calls totaled approximately 18 minutes |
| 1:36 pm: | Pirrello called Penna - call lasted 1-2 minutes |
| 2:01 pm: | Penna called his son - call lasted approximately 1 minute, 59 seconds |
| 2:05 pm: | Penna called Pirrello - call lasted approximately 2-3 minutes |
| 2:08 pm: | Penna called his son - call lasted approximately 2 minutes, 23 seconds |
| 2:12 pm: | Penna's son bought Radiant stock in a trust for the benefit of Penna (500 Radiant shares at $21.75) |
| 3:48 pm: | Penna's son bought more Radiant stock in a trust account for the benefit of Penna (1,500 Radiant shares at $21.93 and 500 Radiant shares at $21.91) |
| 3:49 pm: | Penna's son bought Radiant stock in a brokerage account in his own name (1,300 Radiant shares at $21.95) |
| 3:50 pm: | Penna's son bought Radiant stock in a brokerage account held in the name of Penna's ex-wife (400 Radiant shares at $21.95 and 600 Radiant shares at $21.94) |

46.    That evening, Pirrello and Penna exchanged the following text messages:

| | |
|---|---|
| 5:27 pm (ET): | Pirrello: "How many did we get" |
| 6:14 pm: | Penna: "2500" |

14

| 6:17 pm: | Pirrello: "We should make 25k" |
| 6:19 pm: | Penna: "Only Bgt Stock – should I go back for more?" |

47.     After the ensuing weekend, NCR publicly announced, at 4:17 pm ET on Monday, July 11, an agreement to acquire Radiant through a cash tender offer of $28.00 per share ("Radiant Announcement").  The next day, Radiant stock closed at $27.99 per share, a 30.5% increase from the previous day's closing price of $21.45.

48.     Less than 25 minutes after the Radiant Announcement, at 4:41 pm ET, Pirrello called Penna.

49.     The morning of July 12, the day after the Radiant Announcement, at 9:32 am ET, Penna's son sold the Radiant stock in Penna's ex-wife's account, generating profits of approximately $6,016.  Then, at 9:33 am ET, Penna's son sold the Radiant stock in the Penna trust account, generating profits of approximately $15,153.   At the same time, Penna's son sold the Radiant stock in his own account, generating profits of approximately $7,813.

50.     That evening, Pirrello and Penna exchanged the following text messages:

| 9:28 pm (ET): | Penna: "A little over 15k.  Not too bad. :)" |

| 9:31 pm: | Pirrello: "When you coming back things are a little tight" |
| 9:34 pm: | Penna: "Not for a while.  I could Tsfr to you're a/c but if you want cash….. about 7/26. Your call." |
| 9:37 pm: | Pirrello: "You can just make a payment to amex for me the account number is [XXXX 5005]" |

51.     Less than a week later, on July 18, Penna transferred $5,000 from a bank account he controlled to Pirrello's AMEX account.

52.     Then, four days later, on July 22, 2011, Penna transferred $2,500 from a bank account he controlled to Pirrello's AMEX account.

53.     In November 2011, Pirrello sent Avent a $50,000 personal check made payable to "cash."  Avent deposited Pirrello's check on November 18, 2011.

54.     In addition to Penna, Pirrello also used the information he received from Avent to recommend Radiant to some of his colleagues and clients, who purchased shares of Radiant stock and/or options before the public announcement of the NCR tender offer for Radiant.  These other traders earned a total of approximately $44,405 due to their timely purchases of Radiant securities.

16

E.    **The Midas Tender Offer**

55.    In August 2011, Midas publicly announced that it would evaluate a range of "strategic and financial alternatives," and had retained a financial adviser to assist in the process.  The market exhibited no material reaction to the Midas announcement.  On November 2, TBC submitted a non-binding indication of interest to acquire Midas at $12 to 14 per share.  On November 19, TBC was granted access to detailed Midas financial and business due diligence materials. On November 30, TBC and its financial and business representatives attended meetings by Midas management.  On January 12, 2012, TBC sent a non-binding indication of interest to acquire Midas, at $12.25 to $14.00 per share.

56.    By mid-January, TBC engaged CPA Firm to perform tax due diligence work relating to its planned tender offer for Midas ("TBC Acquisition Engagement").

57.    Avent began working on the TBC Acquisition Engagement on or about January 14, 2012.

58.    Starting on at least January 14, Avent possessed material, nonpublic information about TBC's planned tender offer for Midas.  Among other things, by at least January 14, Avent knew that:  1) the acquisition was structured as an "auction process" – i.e. there was more than one potential buyer interested in

acquiring Midas and Midas could choose the best offer; 2) CPA Firm expected that the due diligence period would last from 3 to 4 weeks; and 3) final bids were due to Midas by mid-February.

59.     On January 22, Midas sent TBC a draft definitive agreement.  On January 24, 2012, Avent learned from CPA Firm's Integration Advisory group that an initial kick-off meeting had been held with a limited group of TBC personnel, that the TBC Acquisition Engagement team should now have access to an online data room, and that CPA Firm's report was due to TBC on February 10, 2012.  On February 8, Avent received and approved CPA Firm's tax due diligence report for the TBC Acquisition Engagement.

60.     Avent and Pirrello communicated multiple times from February 2 through February 27, 2012.  During those communications, Avent disclosed material nonpublic information to Pirrello about TBC's impending acquisition of Midas.

61.     For their part, Pirrello and Penna communicated multiple times from February 3 through February 28, 2012.  During those communications, Pirrello disclosed the material nonpublic information about TBC's impending acquisition of Midas to Penna, who in turn used that information and directed Penna's son to purchase Midas securities in a trust account held for Penna's

benefit at a different securities broker-dealer than Pirrello's employer.  Penna's son followed Penna's directions and purchased Midas securities for Penna's trust account.  Penna's son also purchased Midas securities for himself.

62.     Specifically, the following communications and securities transactions took place on February 2 and 3:

<u>Thursday, February 2</u>:

| | |
|---|---|
| 6:54 pm (ET): | Avent called Pirrello - call lasted less than 1 minute |
| 6:56 pm: | Avent called Pirrello – call lasted approximately 56 seconds |

<u>Friday, February 3</u>:

| | |
|---|---|
| 9:01 am: | Avent called Pirrello – call lasted approximately 1 minute, 57 seconds |
| 9:20 am: | Pirrello called Penna – call lasted 2-3 minutes |
| 9:26 am: | Penna called Penna's son – call lasted 1-2 minutes |
| 9:30 am: | Penna's son called Penna – call lasted 3-4 minutes |
| 9:34 am: | Penna called Pirrello – call lasted less than 1 minute |
| 9:38 am: | Penna called Pirrello – call lasted 3-4 minutes |
| 9:41 am: | Penna called Penna's son – call lasted 2-3 minutes |
| 9:47 am: | Penna's son bought Midas options in a trust account for the benefit of Penna (50 Midas $10 call options expiring March 17, 2012, at $0.75) |

19

11:26 am:          Penna called Pirrello – call lasted 1-2 minutes

2:52 pm:           Penna called Penna's son – call lasted 1-2 minutes

3:52 pm:           Penna's son bought Midas options in a trust account for
                   the benefit of Penna (50 Midas $12.50 call options
                   expiring June 16, 2012, at $0.70)

63.    The next trading day, February 6, 2012, the following securities

transactions took place:

3:36 pm (ET):      Penna's son bought Midas options in a trust account for
                   the benefit of Penna (100 Midas $10 call options
                   expiring March 17, 2012, at $0.75)

3:44 pm:           Penna's son bought Midas options in his brokerage
                   account (68 Midas $10 call options expiring March 17,
                   2012, at $0.80 and 32 Midas $10 call options expiring
                   March 17, 2012, at $0.85)

64.    The following communications then took place from February 21

through February 23:

Tuesday, February 21:

8:16 am (ET):      Avent called Pirrello – call lasted approximately 3
                   minutes, 36 seconds

1:46 pm:           Avent called Pirrello – call lasted approximately 1
                   minute, 35 seconds

2:03 pm:           Pirrello called Penna – call lasted 1 minute or less

2:03 pm:           Penna called Pirrello – call lasted 1 minute or less

20

| | |
|---|---|
| 5:11 pm: | Penna's son called Penna – call lasts between 4-5 minutes |
| 5:57 pm: | Penna called Pirrello – call lasted 1 minute or less |

Wednesday, February 22:

| | |
|---|---|
| 12:25 pm: | Penna called Pirrello – call lasted 1 minute or less |
| 12:28 pm: | Pirrello called Penna – call lasted 1 minute or less |
| 1:58 pm: | Penna called Pirrello – call lasted 1 minute or less |
| 3:49 pm: | Pirrello called Penna – call lasted 1 minute or less |

Thursday, February 23:

| | |
|---|---|
| 9:52 am: | Penna called Pirrello – call lasted 1 minute or less |
| 10:55 am: | Pirrello called Penna – call lasted 1 minute or less |
| 10:56 am: | Penna called Penna's son – call lasted 1-2 minutes |

65.    After these communications on February 21 through February 23, 2012, the following securities transactions took place on February 23:

| | |
|---|---|
| 11:02 am: | Penna's son bought Midas options in a trust account for the benefit of Penna (100 Midas $10 call options expiring March 17, 2012, at $0.75) |
| 11:04 am: | Penna's son bought Midas options in his brokerage account (80 Midas $10 call options expiring March 17, 2012, at $0.80 and 20 Midas $10 call options expiring March 17, 2012, at $0.75) |

21

66.    The following communications then took place on February 27 and February 28, 2012:

Monday, February 27:

7:15 pm (ET):      Pirrello text to Avent: "What happen to that thing"

7:19 pm:           Avent text to Pirrello: "Hear still going forward"

8:08 pm:           Avent called Pirrello – call lasted approximately 3 minutes, 10 seconds

Tuesday, February 28:

11:38 am (ET):     Pirrello called Penna – call lasted 1 minute or less

9:44 pm:           Penna's son called Penna – call lasted 1-2 minutes

10:00 pm:          Penna's son called Penna – call lasted 4-5 minutes

67.    After these communications on February 27 and February 28, the following securities transactions took place on February 29 and March 1:

Wednesday, February 29:

2:49 pm:           Penna's son bought Midas options in his brokerage account (100 Midas $10 call options expiring March 17, 2012, at $0.50)

Thursday, March 1:

12:40 pm (ET):     Penna's son bought Midas options in his brokerage account (100 Midas $10 call options expiring March 17, 2012 at $0.35)

68.     Instead of buying shares of Midas stock, Penna's son bought call options on Midas stock.  A call option is an option to buy 100 shares of the subject stock at a specified "strike" price (here $10 or $12.50 per share) on or before an "expiration" date (here March 17 or June 16, 2012).

69.     If the price of Midas stock were to rise above the strike price before the expiration date, the call options would enable the holder to buy shares of stock from the seller of the option at the strike price and immediately resell the shares for a profit at the higher market price.  In addition, the call options themselves would climb in value and could be sold at a profit.  If, however, the price of Midas stock stayed flat or declined, the call options would expire without generating any profit for Penna and his son.

70.     From February 3 through March 1, 2012, the price of Midas stock steadily fell, from a closing price of $9.64 on February 3 to a closing price of $9.04 on March 1.  But as the price of Midas stock declined, Penna's son bought 700 Midas call options—giving him the right to buy 70,000 shares of Midas stock—at strike prices of $10.00 and $12.50.  And 90% of those call options, 650 of them, carried expiration dates of March 17, 2012.  In other words, over 90% of his call options would expire worthless, unless the price of Midas stock reversed course and increased significantly in less than 3 weeks.

23

71.     On Tuesday, March 13, 2012, at 7:00 am ET, TBC and Midas announced that they had entered into an agreement pursuant to which TBC would acquire Midas through a cash tender offer at $11.50 per share ("Midas Announcement").  That day, Midas stock closed at $11.44 per share, a 27.3% increase from the closing price of $8.99 on March 12.

72.     Less than 20 minutes after the Midas Announcement, at 7:17 am ET, Pirrello called Penna.  The call lasted 1-2 minutes.

73.     A few hours after the Midas Announcement, Avent and Pirrello exchanged the following text messages:

11:25 am (ET):       Avent text to Pirrello: "Happy?"

11:26 am:              Pirrello text to Avent: "Price bad"

11:21 am:              Avent text to Pirrello: "Whatever"

74.     The morning of the Midas Announcement, at 9:50 am ET, Penna's son sold the Midas call options in the Penna trust account, generating profits of approximately $17,500.  At 9:52 am ET and 12:59 pm ET, Penna's son sold the Midas call options in his own account, generating profits of approximately $33,440.

75.     Within a week after the Midas Announcement, on March 20, 2012, Penna transferred $14,000 from a bank account he controlled to Pirrello's AMEX account.

76.     In addition to Penna, Pirrello also used the information he received from Avent to recommend Midas to several of his colleagues and clients, who purchased thousands of shares of stock and/or options before the public announcement of the TBC tender offer for Midas.  These other traders earned a total of approximately $78,200 due to their timely purchases of Midas securities.

### F.      The BrightPoint Acquisition

77.     In 2012, multiple companies, including Ingram Micro and Tech Data, expressed an interest in acquiring BrightPoint.  During May 2012, BrightPoint provided limited due diligence to both companies.  On June 6, 2012, BrightPoint sent Ingram Micro and Tech Data a draft definitive agreement.  By June 25, BrightPoint was negotiating deal terms with both companies.  On June 29, BrightPoint reported to Tech Data that it was prepared to move forward with another party.

78.     Also in June 2012, Tech Data engaged CPA Firm to perform tax due diligence work for its planned acquisition of BrightPoint ("Tech Data Acquisition Engagement").  Avent worked on the Tech Data Acquisition Engagement

25

beginning as early as June 20, 2012.  Through his work on the engagement, Avent

obtained material nonpublic information about Tech Data's planned acquisition

of BrightPoint.  On June 21, Avent learned that the tax due diligence work was to

begin "immediately."  In the early morning on June 29, 2012, the Principal of

CPA Firm's financial due diligence team emailed the CPA Firm's financial due

diligence report to Tech Data, copying Avent.  Later that day, Avent approved

CPA Firm's tax due diligence report for the Tech Data Acquisition Engagement.

79.     During communications on Friday, June 29, 2012, Avent disclosed

material nonpublic information about Tech Data's planned acquisition of

BrightPoint to Pirrello.  That same day, Pirrello disclosed material nonpublic

information to Penna, who in turn used the information to direct his son to

purchase BrightPoint securities in one of the Penna trust accounts at a different

securities broker-dealer than Pirrello's employer.  Penna's son then purchased

BrightPoint securities.

80.     Specifically, the following communications and securities

transactions took place on June 29:

7:35 am (ET):     Avent called Pirrello - call lasted approximately 8
                  minutes, 35 seconds

7:44 am:          Pirrello called Penna – call lasted 1 minute or less

26

| | |
|---|---|
| 9:10 am: | Penna called Pirrello – call lasted 1 minute or less |
| 9:11 am: | Penna called Pirrello – call lasted 1 minute or less |
| 9:56 am: | Penna called Penna's son – call lasted approximately 6 minutes, 53 seconds |
| 10:05 am: | Penna's son bought BrightPoint options in a trust account for the benefit of Penna (100 BrightPoint $5 call options expiring August 18, 2012, at $0.65) |

81.    After the ensuing weekend, at 12:07 am ET on Monday, July 2, 2012, Ingram Micro announced an agreement to acquire BrightPoint for $9.00 per share in cash ("BrightPoint Announcement").  The day of the BrightPoint Announcement, BrightPoint stock closed at $9.01 per share, a 66.5% increase from the closing price of $5.41 on June 29, the previous trading day.

82.    Early in the morning of the day of the BrightPoint Announcement, Pirrello communicated with Penna and Penna communicated with Penna's son:

| | |
|---|---|
| 6:43 am (ET): | Pirrello called Penna – call lasted 1 minute or less |
| 6:46 am: | Penna called Pirrello – call lasted 1-2 minutes |
| 7:50 am: | Penna's son called Penna – call lasted 1-2 minutes |
| 9:05 am: | Penna called Penna's son – call lasted 1 minute or less |
| 9:20 am: | Penna's son called Penna - call lasted 1 minute or less |

83.     On June 29, 2012, when Penna's son bought the BrightPoint call options, BrightPoint stock closed at $5.41, above the $5.00 strike price of the call options.  As a result, the call options would increase in value only if the price of BrightPoint stock rose even farther above the $5.00 strike price in the roughly seven weeks remaining before the call options expired on August 18.  If the stock price did not increase during that time frame, he would earn no profits from the sale or exercise of the options.

84.     Shortly after this string of calls, at 9:35 am ET on July 2, 2012, Penna's son sold the BrightPoint options in the Penna trust account, generating profits of approximately $31,500.

85.     In addition to Penna, Pirrello also used the information he received from Avent to recommend BrightPoint to several of his colleagues and clients, who purchased thousands of shares of BrightPoint stock and/or options before the public announcement of the acquisition of BrightPoint.  These other traders earned a total of approximately $94,000 due to their timely purchases of BrightPoint securities.

86.     In September 2012, Pirrello helped Avent raise $250,000 in cash by facilitating Avent's sale of an illiquid investment.  The investment was a promissory note which Avent had acquired in February 2011 in a private

placement.  The promissory note was issued by a private company and sold to

Avent through Securities Firm.  The promissory note was due on December 31,

2011; but as of September 2012, the issuer had failed to make payment on the

note.  Avent had complained to Pirrello on several prior occasions that Avent

needed to raise cash.  There was no public market for the promissory note, and

therefore it was difficult for Avent to sell.  Pirrello found another one of his

customers who was willing to buy the promissory note from Avent for its face

value, $250,000.

### G.    Defendants Acted in Breach of a Duty of Trust and Confidence

87.    Avent breached his duty of trust and confidence to CPA Firm when

he disclosed material, nonpublic information about the planned acquisitions of

Radiant, Midas, and BrightPoint to Pirrello.

88.    Avent has years of training and experience as an attorney and as a

CPA.  He specializes in mergers and acquisitions.  When Avent breached his

duty of trust and confidence by tipping his stock broker, Pirrello, about the

planned acquisitions of Radiant, Midas, and BrightPoint, Avent knew, or

recklessly disregarded, that it was reasonably foreseeable the information he

disclosed would be used in trades of Radiant, Midas, and BrightPoint securities.

89.     Pirrello has years of experience working in the securities industry. Based on his experience in the securities industry and on his communications with Avent, Pirrello knew, or recklessly disregarded, that Avent was an adviser to an offering company or the issuer with regard to the planned acquisitions of Radiant, Midas, and BrightPoint, and that Avent had misappropriated the information about those acquisitions from CPA Firm in breach of a duty of trust and confidence.  Pirrello also knew about the personal benefits that he was providing to Avent.  Based on his experience in the securities industry, Pirrello knew the proprietary nature, sensitivity, and importance of nonpublic information that a tender offer or other acquisition was planned for a publicly-traded company.   Nevertheless, Pirrello passed the material nonpublic information about the planned acquisitions of Radiant, Midas, and BrightPoint on to Penna, when he knew, or recklessly disregarded, that it was reasonably foreseeable that the material nonpublic information about the planned acquisitions of Radiant, Midas, and BrightPoint would be used in trades of Radiant, Midas, and BrightPoint securities.

90.     Penna has years of experience working in the securities industry. Based on his experience, Penna knew, or recklessly disregarded, that Pirrello had obtained information about the planned acquisitions of Radiant, Midas, and

BrightPoint from an adviser to the offering company or the issuer, or from some other insider, who had breached a duty of trust and confidence in disclosing it to Pirrello.  Penna also knew about the personal benefits that he was providing to Pirrello.  Based on his experience in the securities industry, Penna knew the proprietary nature, sensitivity, and importance of nonpublic information that a tender offer or other acquisition was planned for a publicly-traded company. Penna traded on the basis of the material, nonpublic information he received from Pirrello.

### H.    Avent Continued to Invest through Pirrello into 2015

91.    Despite his displeasure over his prior trading losses, Avent continued to invest through Pirrello well into 2015.

92.    On July 9, 2013, Avent deposited $15,000 into his Securities Firm account to fund an approximately $14,000 investment in a penny stock, because Pirrello was "convinced [the stock] was going to be very profitable."

93.    On June 3, 2015, acting on Pirrello's advice, Avent deposited $50,000 into his Securities Firm account to provide part of the funding for an approximately $100,000 investment in a mobile internet service provider.

### CLAIM ONE

**Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]**

31

**(Against Avent and Pirrello)**

94.     Paragraphs 1 through 93 are realleged and incorporated by reference as though fully set forth herein.

95.     Defendants Avent and Pirrello, in connection with the purchase and sale of Radiant, Midas, and BrightPoint securities, by use of the means and instrumentalities of interstate commerce or of the mails, directly and indirectly: used or employed devices, schemes, and artifices to defraud; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices, and courses of business which had operated as a fraud and deceit upon purchasers and sellers of such securities and upon CPA Firm and its clients.

96.     Avent knew, or was reckless in not knowing, that information regarding the planned acquisitions for Radiant, Midas, and BrightPoint was confidential, material, and nonpublic.  Avent breached the duty of trust and confidence which he owed to CPA Firm by disclosing such material nonpublic information to Pirrello, who he either knew, or was reckless in not knowing, would recommend that another use that information to purchase Radiant, Midas,

and BrightPoint securities.  Avent received a personal benefit from his disclosure to Pirrello.

97.    Pirrello knew, or was reckless in not knowing, that information regarding the planned acquisitions for Radiant, Midas, and BrightPoint was confidential, material, and nonpublic and that Avent had disclosed such material nonpublic information in breach of a duty of trust and confidence.  Pirrello breached the duty of trust and confidence which he owed to CPA Firm by disclosing material nonpublic information to Penna, who he either knew, or was reckless in not knowing, would recommend that another use that information to purchase Radiant, Midas, and BrightPoint securities.

98.    Avent and Pirrello acted with scienter.

99.    By reason of the foregoing, Avent and Pirrello have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5  thereunder [17 C.F.R. § 240.10b-5].

## CLAIM TWO

### Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 Thereunder [17 C.F.R. § 240.14e-3] (Against Avent, Pirrello, and Penna)

100.    Paragraphs 1 through 93 are realleged and incorporated by reference as though fully set forth herein.

**Radiant**

101.   By the end of June 2011, NCR had taken substantial steps to commence a tender offer of the securities of Radiant, including, among other things: 1) retaining financial and business advisers; 2) discussing pricing terms with Radiant; 3) signing a nondisclosure agreement; 4) starting to conduct due diligence on the planned tender offer; and 5) starting to negotiate the terms of the planned tender offer with Radiant.

102.   At the time Penna purchased Radiant securities, Penna was in possession of material information regarding the tender offer for Radiant securities by NCR, which he knew or had reason to know was nonpublic, and which he knew or had reason to know was acquired directly or indirectly from an officer, director, partner, or employee or other person acting on behalf of the offering person or the issuer.

103.   Avent communicated material nonpublic information to Pirrello relating to the Radiant tender offer, when Avent knew or had reason to know that such information came from an officer, director, partner, or employee or other person acting on behalf of the offering person or the issuer, and it was reasonably foreseeable that such communication was likely to result in Pirrello purchasing, or Pirrello causing another person to purchase, Radiant securities in

34

violation of Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

104.   Pirrello communicated material nonpublic information to Penna relating to the Radiant tender offer, thereby causing Penna's trades in Radiant securities, when Pirrello knew or had reason to know that such information came from an officer, director, partner, or employee or other person acting on behalf of the offering person or the issuer and it was reasonably foreseeable that such communication was likely to result in Penna purchasing Radiant securities in violation of Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

**<u>Midas</u>**

105.   By the end of January 2012, TBC had taken substantial steps to commence a tender offer of the securities of Midas, including, among other things: 1) retaining financial and business advisers; 2) attending meetings by management; 3) discussing pricing terms with Midas; and 4) starting to conduct due diligence on the planned tender offer.

106.   At the time Penna purchased Midas securities, Penna was in possession of material information regarding the tender offer for Midas securities by TBC, which he knew or had reason to know was nonpublic, and which he

knew or had reason to know was acquired directly or indirectly from an officer, director, partner, or employee or other person acting on behalf of the offering person or the issuer.

107.   Avent communicated material nonpublic information to Pirrello relating to the Midas tender offer, when Avent knew or had reason to know that such information came from an officer, director, partner, or employee or other person acting on behalf of the offering person or the issuer and it was reasonably foreseeable that such communication was likely to result in Pirrello purchasing, or Pirrello causing another person to purchase, Midas securities in violation of Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

108.   Pirrello communicated material nonpublic information to Penna relating to the Midas tender offer, thereby causing Penna's trades in Midas securities, when Pirrello knew or had reason to know that such information came from an officer, director, partner, or employee or other person acting on behalf of the offering person or the issuer and it was reasonably foreseeable that such communication was likely to result in Penna purchasing Midas securities in violation of Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

109.   By reason of the foregoing, Avent, Pirrello, and Penna have violated and, unless enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court:

(a)   find that defendants Avent and Pirrello violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(b)   find that defendants Avent, Pirrello, and Penna violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

(c)   permanently enjoin defendants Avent and Pirrello from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(d)   permanently enjoin defendants Avent, Pirrello and Penna from violating Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

(e)   order defendants Avent, Pirrello, and Penna, jointly and severally, to disgorge all of the profits associated with trading in Radiant and Midas securities

by Penna's son, in Penna's trust accounts, Penna's son's account and Penna's ex-wife's account, including prejudgment interest thereon;

(f)     order defendants Avent and Pirrello, jointly and severally, to disgorge all of the profits associated with trading in BrightPoint securities by Penna's son in Penna's trust account, including prejudgment interest thereon;

(g)     order defendants Avent, Pirrello, and Penna to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

(h)     retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and order such other relief as the Court may deem appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: July 7, 2016

Respectfully submitted,


s/John E. Birkenheier
JOHN E. BIRKENHEIER

38

Georgia Bar No. 058158
(312) 886-3947 / birkenheierj@sec.gov
ROBERT MOYE
Illinois Bar No. 6225688
(312) 353-1051 / moyer@sec.gov
RUTA G. DUDENAS
Illinois Bar No. 6274848
(312) 886-1435 / dudenasr@sec.gov
U.S. SECURITIES AND EXCHANGE
COMMISSION
175 West Jackson Boulevard, Suite 900
Chicago, Illinois  60604

PAT HUDDLESTON
Georgia Bar No. 373984
404-842-7616 / huddlestonp@sec.gov
U.S. SECURITIES AND EXCHANGE
COMMISSION
950 East Paces Ferry, N.E., Suite 900
Atlanta, GA 30326-1382


COUNSELS FOR PLAINTIFF
U. S. SECURITIES AND EXCHANGE COMMISSION