Attachment C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 1:16-cv-02459-SCJ |
| | : | |
| THOMAS W. AVENT, Jr., and RAYMOND J. PIRRELLO, Jr., | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S OUTLINE OF THE CASE

**FACTUAL OUTLINE**

Thomas Avent was a partner at the accounting firm of KPMG. He is an attorney and a CPA. Avent held a senior position of trust and responsibility. For 15 years, he was the Partner-in-Charge of KPMG's tax practice for mergers and acquisitions for the Southeast. In that position, he led a group that performed tax due diligence on upcoming mergers and acquisitions.

Avent handled sensitive information about upcoming mergers and acquisitions for a living. The information about upcoming mergers and acquisitions that Avent received in connection with his work was valuable, sensitive, and confidential.

1

During 2011 and 2012, Avent obtained material, nonpublic information about three upcoming acquisitions: (1) the 2011 tender offer of NCR Corporation ("NCR") for Radiant Systems, Inc. ("Radiant"); the 2012 tender offer of TBC Corporation ("TBC") for Midas Incorporated, Inc. ("Midas"); and the 2012 acquisition of BrightPoint, Inc. ("BrightPoint") by Ingram Micro Inc. ("Ingram Micro"). Avent gained advance notice of these three mergers, because he performed tax due diligence work on all three.

Avent had a duty of trust and confidence that included a duty not to disclose confidential information he learned during engagements for KPMG clients. Avent knew that the information he learned through his due diligence work was confidential. KPMG had written policies about the importance of preserving confidentiality which expressly prohibited tipping. KPMG's Code of Conduct prohibited Avent from disclosing any confidential or private information to third parties, and required him to be alert to insider trading. KPMG's Insider Trading Policy reinforced that point, prohibiting Avent from disclosing information about upcoming deals to anyone outside the firm. Nevertheless, Avent told his stock broker, defendant Raymond J. Pirrello, about each of the impending mergers. Avent either knew, or was reckless in not knowing, that Pirrello would tip or trade on the inside information.

Pirrello had been a stock broker for almost twenty years. He had passed qualifying examinations and held licenses which allowed him both to act as a broker and to supervise other brokers. Pirrello knew that tipping and trading on material nonpublic information was illegal.

Pirrello acted on the material, non-public information he received from Avent. Pirrello passed the information on to defendant Lawrence Penna. Penna is a long-time, close family friend of Pirrello. Penna himself worked in the securities industry and at one time owned his own brokerage firm, where Pirrello got his first job in the industry. After receiving Pirrello's tips, Penna and members of his family purchased securities of each of the three acquisition targets.

The pattern began with the acquisition of Radiant. By June 23, 2011, Avent had been assigned to the NCR/Radiant engagement and had learned the name of the merger target. From June 23 through July 8, 2011 Avent and Pirrello communicated numerous times by telephone call and text message. In these communications, Avent shared confidential information with Pirrello about the acquisition. On July 8, 2011, Avent received a due diligence report about the sale of Radiant. That same day, Avent called and texted Pirrello. Within hours, Pirrello called Penna and passed the material nonpublic information on to him; Penna's family then quickly bought Radiant stock. Later that day, Pirrello and

Penna exchanged text messages in which Pirrello inquired how many shares "we" got and predicted that "we should make 25K."

The next business day, NCR announced to the public that it was buying Radiant. The price of Radiant stock rose by over 30%. The following day, Penna's family sold their Radiant stock, receiving over $28,000 in illicit profits. Other clients of Pirrello also bought and sold Radiant around the merger announcement and profited over $44,000 from their trades.

And then it happened again. By January 14, 2012, Avent had been assigned to the TBC/Midas engagement and had learned the name of the target. During January and February 2012, Avent and Pirrello communicated by telephone call and text message. In these communications, Avent shared confidential information with Pirrello about the acquisition. After communicating with Avent, Pirrello spoke with Penna and passed the material nonpublic information on to Penna. Penna's family, in turn, began buying Midas stock and options. Penna's family even bought out-of-the-money stock options with short-term expiration dates. That was a risky proposition, unless they had confidential information about the acquisition.

The timing of the purchases by Penna's family is especially telling. In August 2011, Midas announced that it was exploring strategic alternatives. The Pennas bought no Midas securities in the wake of this announcement. To the

contrary, the Pennas bought no Midas securities for six months. In the meantime, however, Avent was assigned to the TBC/Midas due diligence engagement, learned the name of the target, and communicated with Pirrello. On February 1, 2012, a news story appeared about Midas and another possible suitor. But still the Pennas made no purchases—until after further communications from Avent to Pirrello and from Pirrello to Penna.

After the Pennas had begun buying Midas stock options, Pirrello sent Avent a text message on February 27, 2012 asking, "What happen to that thing?" Avent promptly responded, "Hear still going forward." Avent and Pirrello then spoke by telephone. Pirrello and Penna then spoke by telephone, Penna spoke with his son, and Penna's son then bought more Midas stock options.

On March 13, 2012 Midas announced that it was going to be acquired, and the price of Midas stock rose by over 27%. Penna's son then sold the stock options, generating profits of over $50,000. Pirrello's other clients made over $78,000 from their well-timed trades in Midas stock.

And then it happened a third time. Avent learned material non-public information about the upcoming acquisition of BrightPoint, and shared that information with Pirrello. Within hours, Avent called Pirrello, Pirrello called Penna, Penna called his son, and Penna's son bought BrightPoint stock options. The very next trading day, the acquisition of BrightPoint became public, and the

stock rose by over 66%. Penna's family sold the options for over $31,000, and Pirrello's other clients made approximately $94,000. The day before the Pennas bought BrightPoint options, a positive news story ran about BrightPoint landing a new customer. But the Pennas did not buy until the following day, after there had been communications from Avent to Pirrello and from Pirrello to Penna.

Avent and Pirrello both benefited from their conduct. In July 2011, just after the Radiant acquisition, Penna transferred $7,500—half his trading profits—into Pirrello's AMEX credit card account. Then in March 2012, one week after the Midas merger, Penna transferred $14,000 to Pirrello's AMEX credit card account.

For their part, Avent and Pirrello engaged in a pattern of exchanging benefits from 2011 through 2012. In early 2011, Pirrello informed Avent of an opportunity to invest in a promissory note issued by a firm named CSG Holdings, LLC (the "Cate Street Note"). Pirrello informed Avent of the opportunity, because the Cate Street Note paid a high rate of interest and presented Avent an opportunity to recoup some prior trading losses Avent had experienced in his brokerage account. Avent bought the Cate Street Note for $250,000 in February 2011.

In his brokerage account, however, Avent continued to suffer trading losses. Avent began demanding that Pirrello pay him $535,000 to make good on

some of those losses.  Pirrello stalled, and paid Avent nothing.  Then in June 2011, Avent tipped Pirrello about the upcoming NCR/Radiant tender offer.  A few months later, in November 2011, Pirrello sent Avent a check for $50,000, made payable to "Cash," in partial payment of the $535,000.  Avent deposited Pirrello's check and continued to demand that Pirrello pay the balance of the $535,000.  Pirrello continued to stall.

In the meantime, the issuer of the Cate Street Note failed to repay the principal amount of the Note.  Avent continued to press Pirrello to pay the balance of the $535,000 and also started demanding that Pirrello find a buyer for the past due Cate Street Note.  In February 2012, Avent tipped Pirrello about the TBC/Midas merger.  Pirrello, however, made no payments and did not come up with a buyer.  In late June 2012, Avent tipped Pirrello again, about the upcoming acquisition of Radiant.  Several weeks later, Pirrello texted Avent that he had found a buyer for the Cate Street Note.  Avent sold the Note for its full face value—$250,000—to another customer of Pirrello's in September 2012.

Throughout 2011 and 2012, Pirrello continued to provide investment advice to Avent, who kept his brokerage account with Pirrello until 2016.  As late as 2015 Avent deposited $50,000 of new funds into his account with Pirrello and used that money for part of the purchase price of a new stock investment

recommended by Pirrello. Avent did not close his account with Pirrello until the SEC staff informed Avent that they intended to recommend charges against him.

### **RELEVANT LAW:**

The "securities markets—the comparative honesty of which is one of our nation's great business assets—cannot tolerate . . . cheating if those markets are to retain the confidence of investors and the public alike." *SEC v. Payton*, 97 F. Supp. 3d 558, 559 (S.D.N.Y. 2015). The laws against insider trading "insure honest securities markets and thereby promote investor confidence." *United States v. O'Hagan*, 521 U.S. 642, 658 (1997). Insider trading takes "unfair advantage of uninformed stockholders," and "harms members of the investing public." *Id.* at 652, 656 (citation omitted). Investors "likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law." *Id.* at 658. Insider trading is analogous to "embezzlement"—it is the "misuse, by trading, of stolen information." *United States v. Libera*, 989 F.2d 596, 600 (2d Cir. 1993). Insider trading "is a form of cheating, of using purloined or embezzled information to gain an unfair trading advantage." *See Payton*, 97 F. Supp. 3d at 559.

The SEC must establish an insider trading claim by a preponderance of the evidence. *SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004). *See also Steadman v. SEC*, 450 U.S. 91, 95 (1981)(rejecting clear-and-convincing standard of proof

8

and affirming decision of Fifth Circuit that burden of proof is preponderance-of-the-evidence in context of fraud charges alleged in SEC administrative proceedings).

A preponderance of the evidence means that evidence in support of the SEC's claim must be more convincing and persuasive, however slightly, than the evidence opposed to it.  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 388-91 (1983); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 355 (1943); *SEC v. Pirate Investor LLC*, 580 F.3d 233, 239, 242 (4th Cir. 2009); *SEC v. Maxxon*, 465 F.3d 1174, 1179 (10th Cir. 2006); *SEC v. Michel*, 521 F. Supp. 2d 795, 823 (N.D. Ill. 2007); *SEC v. Jakubowski*, 912 F. Supp. 1073, 1079 (N.D. Ill. 1996).

To prove insider trading, the SEC must establish that the defendant "(1) tip[ped] (2) material non-public information (3) in breach of a fiduciary duty of confidentiality owed to shareholders (classical theory) or the source of the information (misappropriation theory) (4) for personal benefit to the tipper." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012).  The SEC also must allege that the defendant acted with *scienter*. *Id.*

The misappropriation theory of insider trading is applicable in this case. Under the misappropriation theory, a person violates Section 10(b) of the Exchange Act and Rule 10b-5 thereunder "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the

9

source of the information." *O'Hagan*, 521 U.S. at 652. Courts have held that employees owe a fiduciary duty to their employers to protect any confidential information entrusted to them by their employer during the course of employment. *SEC v. Cherif*, 933 F.2d 403, 411 (7th Cir. 1991). An individual who breaches a fiduciary duty by tipping others can be liable under Section 10(b) even if he does not trade on the information. *Dirks v. SEC*, 463 U.S. 646, 660 (1983).

To establish a tipper's liability, the Commission must show that the tipper conveyed material, nonpublic information in breach of a fiduciary or similar relationship of trust and confidence, and that the tipper received a benefit, directly or indirectly from the disclosure. *Id.*, 463 U.S. at 659 – 62; *SEC v. Yun*, 327 F.3d 1263, 1269-70 (11th Cir. 2003).

A tippee violates the antifraud provisions by trading while in possession of material, nonpublic information, or disclosing such information to others, if the tippee knew or should have known that the information was disclosed in breach of a fiduciary duty. *Dirks*, 463 U.S. at 659 – 64. The test for insider trading liability for second-tier tippees and those further downstream is the same as the test for first-tier tippees. *SEC v. Obus*, 693 F.3d at 288 – 89; *see also SEC v. Megalli*, 157 F. Supp. 3d 1240, 1243 (N.D. Ga. 2015). The Commission is not required to show that the tippee knew the details of the insider's involvement, *SEC v. Thrasher*, 152 F. Supp. 2d 291, 304 (S.D.N.Y. 2001), because "liability under

Section 10(b) is not predicated upon the trader's knowledge of the insider's identity. *Id.* at 305-306 n.6 (citation omitted).

The SEC is not required to present any direct evidence of insider trading. Circumstantial evidence is sufficient to establish the basis for insider trading liability. *See SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004); *SEC v. Sargent*, 229 F.3d 68, 74-75 (1st Cir. 2000). Indeed, "direct evidence is rarely available in insider trading cases, since usually the only witnesses to the exchange are the insider and the alleged tippee, neither of whom are likely to admit to liability." *SEC v. Roszak*, 495 F. Supp. 2d 875, 887 (N.D. Ill. 2007).

The benefit to the tipper can be cash or something else, such as maintaining a relationship or helping out a close friend or relative. *Salman v. United States*, 137 U.S. 420, 427-28 (2016)(relative) ; *Dirks*, 463 U.S. at 664 (close friend or relative); *Yun*, 327 F.3d at 1269 (relationship); *United States v. Jiau*, 734 F. 3d 147, 153 (2d Cir. 2013)(relationship); *SEC v. Sargent*, 229 F.3d 68, 75 (1st Cir. 2000)(relationship). The benefit can also be investment advice, even if the advice is not followed. *United States v. Riley*, 621 F.3d 312, 332 (3d Cir. 2010). An intention to benefit from the tip is sufficient. *United States v. Gupta*, 111 F. Supp. 3d 557, 560 (S.D.N.Y. 2015). The showing needed to prove an intent to benefit is not extensive. *See SEC v. Avent, et al.*, 2017 U.S. Dist. LEXIS 109707 (N.D. Ga. June 14, 2017) at *11 (*citing Yun*, 327 F.3d at 1280).

Pirrello's assistance to Avent in selling the overdue Cate Street Note for full face value constitutes adequate benefit.  *See Avent, et al.*, 2017 U.S. Dist. LEXIS 109707, at * 9.  Likewise, Avent benefited from his tipping by "greasing the wheel" and bolstering his relationship with Pirrello in an effort to settle their dispute over Avent's trading losses.  *See id.*, at *10-11 (*citing Yun*, 327 F.3d at 1280).

Liability under the misappropriation theory requires proof of *scienter*, defined as a mental state embracing "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  *Scienter* may be inferred from circumstantial evidence.  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 – 91, n.30 (1983); *Ginsburg,* 362 F.3d at 1298.  Information is material for insider trading liability if "there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision.  *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449 (1976).  The element of *scienter* may be satisfied by conduct that is either knowing or reckless.

Information about a proposed acquisition is material. *Ginsburg*, 362 F.3d at 1302 ("A merger is an event of considerable magnitude to an investor, and preliminary merger negotiations constitute concrete steps indicating an increasing possibility of a merger occurring.").  Trading by those who knew the information was nonpublic is evidence of materiality, as is a significant increase

in stock price once the news is announced. *SEC v. Maio,* 51 F.3d 623, 637 (7th Cir. 1995) (trading); *In re Merck & Co., Inc. Securities Litig.*, 432 F.3d 261, 269 (3d Cir. 2005) (stock price).

Even when some information already exists publicly about a potential transaction, a tip from a source with access to information that provides additional reliability may still be material "because it lessens the risk from uncertainty." *United States v. Contorinis*, 692 F.3d 136, 143 – 44 (2d Cir. 2012); *SEC v. Mayhew*, 121 F.3d 44, 51 (2d Cir. 1997).

Section 14(e) of the Exchange Act prohibits "any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer." Under Rule 14e-3(a), if "a substantial step or steps" have been taken to commence a tender offer and a person possesses material information concerning such tender offer that he knows or has reason to know is nonpublic and that he knows or has reason to know has been acquired, directly or indirectly, from the offering person or the target company or any of their respective officers, directors, employees or advisers, then he may not: (i) "purchase or sell or cause to be purchased or sold any of such securities" sought in such tender offer; or (ii) "communicate material nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation" of Rule 14e-3. 17 C.F.R. § 240.14e-3; *see Ginsburg*,

362 F.3d at 1303; *see also* Tender Offers, Sec. Exch. Act Rel. No. 34-17120, 1980 WL 20869, at *6; *SEC v. Ballesteros Franco*, 253 F. Supp.2d 720, 726-27 (S.D.N.Y. 2003); *SEC v. Falbo*, 14 F. Supp.2d 508, 524-25 (S.D.N.Y. 1998).

In order to establish liability under Section 14(e) of the Exchange Act and Rule 14e-3 thereunder, the Commission must show *scienter*, which in this context requires that the tippee "possess material nonpublic information," and that the "material nonpublic information be used in a trade." *Ginsburg*, 362 F.3d at 1297-98. "Proof of knowledge of such information at the time of a trade gives rise to a strong inference of use." *Id*.

Unlike the insider trading prohibitions of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 14(e) of the Exchange Act and Rule 14e-3 thereunder impose an obligation to "disclose or abstain" from trading or tipping regardless of whether an individual owes a fiduciary duty to respect the confidentiality of the information. Tender Offers, Sec. Exch. Act Rel. No. 34-17120, 1980 WL 20869, at *6 (Sept. 4, 1980). . . ." *O'Hagan*, 521 U.S. at 673; *United States v. Chestman*, 947 F.2d 551, 557 (2d Cir. 1991); *Maio*, 51 F.3d at 635. Rule 14e-3 does not require that the person have knowledge that the material, nonpublic information in his possession relates to a tender offer. *Ginsburg*, 362 F.3d at 1304; *Sargent*, 229 F.3d at 79. *See also* "Tender Offers," Securities Exchange Act Release No. 34-17120, 1980 WL 20869, at *6.

In total, the Pennas gained profits of approximately $111,422 by trading in Radiant, Midas and BrightPoint after being tipped by Pirrello. The SEC intends to seek civil monetary penalties based on the profits gained by the Pennas, together with permanent injunctive relief, against Defendants Avent and Pirrello. *See* 15 U.S.C. § 78u(d)(1) and § 78u-1(a). All the issues regarding remedies are to be decided by the Court, rather than by the jury, in a subsequent proceeding in the event that the SEC prevails against one or both defendants on liability issues.

**RULES, REGULATIONS, STATUTES, and ILLUSTRATIVE CASES RELIED Upon by the SEC:**

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)

Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e)

Section 21(d)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(1)

Section 21A(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-1(a)

Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5

Exchange Act Rule 14e-3, 17 C.F.R. § 240.14e-3

*SEC v. Avent, et al.*, 2017 U.S. Dist. LEXIS 109707 (N.D. Ga. June 14, 2017)

*United States v. O'Hagan*, 521 U.S. 642 (1997)

*Dirks v. SEC*, 463 U.S. 646, 660 (1983)

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 388 – 91, n.30 (1983)

*Steadman v. SEC*, 450 U.S. 91, 95 (1981)

*Aaron v. SEC*, 446 U.S. 680, 686 n.5 (1980)

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)

*TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449 (1976)

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 355 (1943)

*SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 n.6 (11th Cir. 2005)

*SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004)

*SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004)

*SEC v. Yun*, 327 F.3d 1263, 1269-70 (11th Cir. 2003)

*SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)

*SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978)

*SEC v. Parigian,* 824 F.3d 5, 15-16 (1st Cir. 2016)

*U.S. v. Newman*, 773 F.3d 438, 447 (2d Cir. 2014), *cert. denied*, 2015 U.S. LEXIS 6104 (Oct. 5, 2015)

*SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)

*United States v. Contorinis*, 692 F.3d 136, 143 – 44 (2d Cir. 2012)

*United States v. Riley*, 621 F.3d 312, 332 (3d Cir. 2010)

*SEC v. Pirate Investor LLC*, 580 F.3d 233, 239, 242 (4th Cir. 2009)

*SEC v. Maxxon*, 465 F.3d 1174, 1179 (10th Cir. 2006)

*In re Merck & Co., Inc. Securities Litig.*, 432 F.3d 261, 269 (3d Cir. 2005)

*SEC v. Sargent*, 229 F.3d 68, 74-75 (1st Cir. 2000)

*SEC v. Mayhew*, 121 F.3d 44, 51 (2d Cir. 1997)

*SEC v. Maio,* 51 F.3d 623, 637 (7th Cir. 1995)

*United States v. Libera*, 989 F.2d 596, 600 (2d Cir. 1993)

*United States v. Chestman*, 947 F.2d 551, 557 (2d Cir. 1991)

*SEC v. Cherif*, 933 F.2d 403, 411 (7th Cir. 1991)

*SEC v. Megalli*, 157 F.Supp. 3d 1240, 1243 (N.D. Ga. 2015)

*SEC v. Payton*, 97 F. Supp. 3d 558, 559 (S.D.N.Y. 2015)

*United States v. Gupta*, 111 F. Supp. 3d 557, 560 (S.D.N.Y. 2015)

*SEC v. Roszak*, 495 F. Supp. 2d 875, 887 (N.D. Ill. 2007)

*SEC v. Michel*, 521 F. Supp. 2d 795, 823 (N.D. Ill. 2007)

*SEC v. Ballesteros Franco*, 253 F. Supp. 2d 720, 726-27 (S.D.N.Y. 2003)

*SEC v. Thrasher*, 152 F. Supp. 2d 291, 304 (S.D.N.Y. 2001)

*SEC v. Falbo*, 14 F. Supp. 2d 508, 524-25 (S.D.N.Y. 1998)

*SEC v. Jakubowski*, 912 F. Supp. 1073, 1079 (N.D. Ill. 1996)

Tender Offers, Sec. Exch. Act Rel. No. 34-17120, 1980 WL 20869, at *6 (Sept. 4, 1980).