## ATTACHMENT D-1

## Defendant Thomas W. Avent, Jr.'s Outline of the Case

## INTRODUCTION

Avent did not violate any federal securities laws.  Avent did not disclose any material, nonpublic information; he did not trade in any of the securities at issue in this case, and certainly not on the basis of any material, nonpublic information; and he did not benefit from the disclosure of any "inside" information. Correspondingly, there is no evidence that any trade at issue in this action was made on the basis of material, nonpublic information. And even if the SEC is right that some trades were based upon nonpublic information, that information did not come from Avent.  Any circumstantial inference to the contrary is not reasonable. Thus, the United States Department of Justice declined to bring any criminal charges.  And the SEC filed the civil complaint in this matter a mere two days before the expiration of the statute of limitations.

Likewise, Avent did not receive any benefit, did not act with the expectation of receiving any benefit, and nothing he allegedly received or was promised from Pirrello was intended to be, or understood to be, a benefit in exchange for material, nonpublic information.  Because he did not disclose nonpublic information to anyone and did not act with the intent to improperly benefit, Avent also did not

breach any of his fiduciary duties, and he did not undertake any actions with the knowledge, intent, or scienter required for him to be liable for a violation of the securities laws.

Avent was the victim of securities fraud, not a perpetrator of it. Over the course of his business relationship with Garden State Securities and Defendant Ray Pirrello, Avent lost over $2 million, much of which was due to Pirrello's misrepresentations about investments and his failure to follow Avent's directions with respect to the management of Avent's account.

**A. Background**

Until this action was filed, Avent was the partner in charge of M&A/Tax in the southeastern United States for KPMG, LLP ("KPMG"), one of the most prominent tax, audit, and advisory firms in the world. In that role, Avent often supervised tax-related due diligence for KPMG clients that were considering acquiring publicly traded companies. As a result of that work, Avent learned nonpublic information about hundreds of planned acquisitions. And because other KPMG personnel routinely discussed nonpublic information about transactions other than those on which he worked directly, Avent possessed nonpublic information about even more. Avent never shared any of that nonpublic information with anyone outside of KPMG. He certainly never traded on it, as

shown by the fact that he has lost such large amounts of money in the stock market.

Before joining KPMG, Avent worked at several well-respected law firms in New York and Washington, D.C.; at the United States Tax Court; and at George Washington University.  He held CPA licenses in multiple states and was licensed to practice law in New York, Washington D.C., and Mississippi for decades.  For nearly 40 years in these roles, Avent was entrusted with confidential information relating to hundreds of individuals and entities.  Until this case, Avent was never accused of doing anything wrong or improper with that information, was never the subject of any sort of disciplinary action by a licensing authority, and was never even the subject of a client's complaint.

In 2007, a stockbroker cold-called Avent to solicit him as a client.  Shortly thereafter, another stockbroker, Ray Pirrello, took over responsibility for Avent's account.  Pirrello informed Avent that he had many KPMG partners as clients, as well as many clients who were partners at other major accounting firms.  Indeed, Pirrello and his fellow brokers at Garden State counted dozens of KPMG professionals as clients.

Avent has never had any sort of personal relationship with Pirrello; Pirrello was just Avent's stockbroker.  In fact, Avent did not meet Pirrello in person for the

first time until June of 2014—after the alleged events at issue in this case.  Avent also did not know any other broker at Garden State.  Pirrello eventually moved to Garden State Securities, Inc. ("Garden State") in New Jersey, and Avent moved his account to Garden State with Pirrello.

In 2011, Pirrello convinced Avent to invest approximately $855,000 with him.  Of that amount, about $535,000 was to be invested in the public securities markets.  Given the historically very poor performance of Avent's account with Pirrello, Avent directed Pirrello to employ stop-losses and other measures to limit the amount of any loss to $100,000. Pirrello did not follow Avent's instructions; he executed unauthorized trades, traded on margin, and did not put in place any stop-loss restrictions.  Over the course of his business relationship with Garden State and Pirrello, Avent lost over $2 million in his investments with Pirrello, with approximately $500,000 of those losses occurring during 2011 alone.  Of the approximately $855,000 Avent invested in 2011, Avent withdrew or recovered only $370,000—$70,000 was withdrawn in cash; as described below, Pirrello paid Avent $50,000 pursuant to a settlement agreement between the two whereby Pirrello agreed to cover Avent's losses; and Avent sold a note for which he was the lender for  $250,000.  The rest was lost.

During this period of time, and into 2012, Avent communicated regularly with Pirrello by phone, text message, and email.  Their communications were about Avent's investments with Pirrello, both investments Avent had already made and investments Pirrello wanted him to make.  They were also about Pirrello's mismanagement of Avent's account—which Pirrello had misled Avent about for months.  Ultimately, Avent discovered Pirrello's malfeasance and threatened to sue Pirrello to recover the losses.  In July of 2011, to avoid a lawsuit, Avent and Pirrello entered into a settlement agreement.  That settlement agreed is documented in numerous contemporaneous communications between Avent and Pirrello – communications that occurred long before any SEC investigation.  In that agreement, Pirrello agreed to pay Avent $535,000 to compensate Avent for the losses.  Pirrello made one payment to Avent toward that settlement—$50,000 in November of 2011. Other than that one payment, Pirrello has paid nothing more toward the $535,000 settlement amount.   While the SEC alleges that Pirrello paid Avent the $50,000 for an alleged tip four months earlier, that payment was actually toward the amount due under the Avent-Pirrello settlement agreement, a fact that is well documented in their communications.

Because Pirrello paid Avent only $50,000 of the $535,000 he owed Avent under their settlement agreement, Avent's and Pirrello's relationship remained

very strained.  In 2013 Avent retained a law firm in Mississippi to assist in his efforts to collect from Pirrello.  That firm ultimately prepared a note for Pirrello to sign, which evidenced a debt to Avent of $500,000 (consisting of the remaining $485,000 balance under the settlement agreement, plus an additional $15,000 Avent had invested with Pirrello after their dispute arose).  Through 2013 and into 2014, Avent insisted that Pirrello sign the note or Avent would file suit against him, but Pirrello resisted.  Eventually, in June of 2014, Avent traveled to New York to meet with Pirrello and have him sign the note.  During that June 2014 meeting—which was the first time Avent had met Pirrello in person—Pirrello signed the note.

Despite Pirrello's decision to sign the note, he still did not pay Avent the $500,000 he owed him.  Finally, in early 2016, Avent filed suit on the note against Pirrello. That lawsuit is pending.

As a result of their disputes, Avent did not invest any additional funds in his Garden State account, other than the $15,000 he had invested after their dispute first arose (and which Pirrello had promised to repay pursuant to the note) and another $50,000 that Avent invested in 2015.  That 2015 investment was in a security that one of Avent's KPMG partners had bought through Pirrello and that

had performed very well.  But ultimately, even those additional investments failed, leading to still more losses for Avent.

The SEC's allegations relate to three transactions (collectively, the "Deals"). Avent does not dispute that he worked on the Deals in the course of his duties at KPMG, but they were just three deals among hundreds on which he worked. Specifically, in June and July of 2011, Mr. Avent supervised tax due diligence for NCR Corporation's ("NCR") proposed acquisition of Radiant Systems, Inc. ("Radiant"), billing approximately 33 hours on that matter (the "Radiant Deal"). Mr. Avent worked approximately 6.5 hours supervising tax due diligence on TBC Corporation's ("TBC") proposed acquisition of Midas, Inc. ("Midas") in February of 2012 (the "Midas Deal").  And Avent worked approximately 6.5 hours supervising tax due diligence on Tech Data, Inc.'s ("Tech Data") planned (but ultimately not implemented) acquisition of BrightPoint, Inc. ("BrightPoint") in June of 2012 (the "BrightPoint Deal").[1]

While Avent does not dispute that he worked on the Deals, he did not provide any nonpublic information about them to anyone and therefore did not benefit from any such disclosure, breach any duty arising from the services he

---

[1]     Tech Data did not acquire BrightPoint; instead, Ingram Micro Systems, Inc. ("Ingram Micro") did so.  Avent did not work on (or have any nonpublic information about) Ingram Micro's acquisition of BrightPoint.

provided in connection with those Deals, or act with scienter, intent, or knowledge of any wrongdoing.  More to the point, the timeline of events and the lack of evidence prove that Avent did not disclose any nonpublic information.  Thus, as more fully set out below, Avent did not violate any securities laws.

**B. Those who traded and recommended target-company securities did so based upon publicly available information.**

As an initial matter, there is no evidence that any trades at issue in the SEC's case were based upon material, nonpublic information about the Deals, as opposed to publicly available information about the target entities.  Because there was no underlying violation of any securities law by an alleged "tippee," Avent cannot be liable as an alleged "tipper."

First, as the SEC alleged in its complaint, several Garden State brokers were involved in trades of Radiant, Midas, and BrightPoint before the Deals were announced.  Thus, as the SEC's investigation demonstrated, whatever information formed the basis for pre-announcement trades in those securities flowed freely between Garden State brokers.  The Garden State brokers involved in trades in securities of the targets of each Deal testified under oath that they relied upon publicly available information such as market data, increased trading volume, and news stories.  Publicly available data bear out their statements.  Tellingly, none of

the other Garden State Brokers who actually engaged in these trades has been charged, either civilly or criminally, by any regulator.

With respect to Radiant, there were at least two significant, unusual spikes in trading volume before the date on which the SEC alleges Avent provided information to Pirrello.  The trading volume on June 24, 2011, was three times greater than the number of shares traded on any of the 10 preceding days.  That spike occurred before KPMG was even engaged to provide services in connection with the Radiant Deal.  And trading volume on that date exceeded even the number of shares traded on July 11, 2011, the date the Radiant transaction was announced. Similarly, on July 7, 2011, before the SEC alleges that Avent tipped Pirrello, there was a second, large spike in trading volume that, again, exceeded the number of shares traded on the July 11 announcement date.  Among other things, publicly available information about those spikes in trading volume, not nonpublic information, was the basis for trading by Garden State brokers and clients.

Most of the trades in Midas on which the SEC's claims are based occurred on either February 3, 2012, February 22, 2012, or on the trading day immediately following those dates.  On those dates, trading volume more than doubled the average for Midas securities and was significantly higher than the volume on any day in the preceding five months of trading.  And all other purchases of Midas the

9

SEC has put in issue were executed after there were four significant, unusual spikes in trading volume in the month preceding the Midas Deal.  Notably, Midas had publicly announced that it was interested in being acquired back in August of 2011—about six months before any of these trades occurred.  The performance of Midas's stock price after that announcement in August of 2011—and the substantial amount of press that accompanied and followed the announcement—shows that information about the potential Midas transaction was out in the market.  These and other publicly available facts, not any inside information, were the basis for the trades in Midas securities at issue in this matter.

As for BrightPoint, the volume of trading on June 15, 2012, shortly before the Garden State trades (and before Avent had any knowledge that BrightPoint might be an acquisition target), nearly doubled the volume on any of the preceding ten days.  And in the three days before the BrightPoint acquisition was announced—the same days in which most of the Garden State purchases of the BrightPoint stock occurred—the average trading volume was three times greater than the average during the previous three weeks.  Again, those and other publicly available facts, not any nonpublic information, were the basis for any trading in BrightPoint securities at issue in this matter.

Additionally, Garden State clients (including Lawrence Penna, whom the SEC alleges in its complaint received inside information from Pirrello) purchased options to buy stock above the tender-offer prices that were ultimately announced, at least for the TBC/Midas Deal. Those tasked with conducting tax due-diligence services in connection with a planned acquisition are sometimes privy to the price that the acquiring company plans to offer for shares in the target. That tender-offer price is confidential information because it can be misused by those in the market, who might buy options with an exercise price below the tender-offer price. With respect to the TBC/Midas Deal, Avent learned the acquisition price because he performed a Section 382 analysis of Midas for TBC. But the fact that Penna (and other Garden State traders) still purchased so-called "out-of-the-money" options (*i.e.*, options that were priced at a number above the tender-offer price the acquiring company ultimately offered) shows that Penna and others did not know the acquisition price for Midas, which shows that Avent did not tip. It was not any nonpublic information that motivated their trades; rather, it was public information in the market.

Garden State brokers testified under oath that they traded in Radiant, BrightPoint, and Midas securities as a result of information that was publicly available in the market. Records of what actually occurred with respect to these

securities on the dates at issue in this matter corroborate that testimony.  Because there were no trades executed based upon any nonpublic information, there was no violation of the securities laws.  Avent cannot be held liable.

## C. Avent did not provide material, nonpublic information to Pirrello.

Even assuming someone at Garden State possessed and traded upon nonpublic information about the Deals, that information did not come from Avent. Avent did not provide material, nonpublic information to Pirrello or anyone else. Any circumstantial inference to the contrary is unsupportable, given the number of other individuals who possessed material information about the Deals, many of whom also had connections to Garden State.  Because he did not tip anyone, Avent cannot be liable for any violation of the securities laws.

First, there is no direct evidence that Avent provided any information about the Deals to Pirrello.  Although the SEC has identified certain text-message exchanges that it contends related to the TBC/Midas Deal, those exchanges related to completely separate matters, not the Deals—specifically, to a real-estate deal Avent and his brother were pursuing in Mississippi and to a stock Pirrello had pitched to Avent and others).  Avent explained these circumstances during his deposition, and contemporaneous, documented communications, as well as publicly available information relating to the stock Pirrello had pitched, support

Avent's explanation.  Notably, the SEC would never have seen the text messages had Avent not been particularly forthcoming and cooperative during the SEC's pre-suit investigation.  When Avent discovered a long-discarded and broken phone buried in a desk drawer that he was not even sure was his, he turned its contents over to the SEC.  The text messages on which the SEC relies, which the SEC considers to be the central pieces of evidence against Avent, came from that phone.  These circumstances underscore Avent's more plausible, innocent explanations for the text message exchanges.[2]

Because it lacks direct evidence, the SEC has indicated that it intends to ask the jury to draw a circumstantial inference that Avent was the source of the alleged material, nonpublic information at issue in this case from two facts: (1) Avent had a relationship with Pirrello; and (2) Avent possessed material nonpublic information about the Deals before they were publicly announced.

Any such inference would be unreasonable.  First, the SEC assumes (without basis) that any tips came from the same firm, KPMG.  But there were many, many accounting firms, law firms, investment banks, and other firms involved in the Deals.  Moreover, many people within those multiple entities possessed nonpublic

---

[2]    Similarly, Avent voluntarily spoke with the Federal Bureau of Investigation about the matters at issue in this case, answering all of the FBI's questions.  During that interview, Avent told the FBI agents about the $50,000 payment from Pirrello and that the payment related to the repayment agreement.

information about the Deals.  If there was any inside information tipped here, it could have come from any of those other sources—and from a different source for each Deal.  The SEC assumes that there was a single source for all three of the Deals, but it has no basis for that assumption.  And the SEC's investigation did not even look into whether those other firms or other people also had a connection to Pirrello or Garden State.  Notably, Pirrello acknowledges that he had clients at many professional-services firms, not just KPMG.

Second, the SEC has recognized that any individual who both had a connection to Pirrello and possessed nonpublic information about a Deal is a possible tipper. Even within KPMG, there are others who share those two characteristics.  Discovery obtained by Avent shows at least five KPMG partners and employees (other than Avent) who (1) had a documented communication with Garden State (Pirrello's firm) during the relevant time period and (2) possessed material nonpublic information about one or more of the Deals.  Each of those individuals is a possible tipper, and their existence undermines the inference the SEC will ask the jury to draw that Avent was the tipper here.[3]  Any inference that

---

[3]     The SEC concedes in its complaint that information relating to the Deals (whether or not it was nonpublic information) was passed around among Garden State brokers.  A communication between someone from KPMG other than Avent and anyone from Garden State who worked in the same New Jersey office as

it was more likely that Avent, as opposed to one of those other individuals, was the source of any alleged tip is not reasonable.

Even accepting the SEC's premise that someone at KPMG was the source of the nonpublic information allegedly passed to Pirrello, many partners and employees at KPMG possessed the same information about the Deals that Avent possessed.  And more than two dozen KPMG partners and employees (including at least five partners and employees who possessed nonpublic information about one or more the Deals) had relationships with Pirrello or other Garden State brokers. Moreover, at the time of the alleged tips, Avent did not know whether any of the Deals would close, so he had no information even to tip.  Any inference that inside information here came from Avent would not be reasonable.

The SEC also contends that only KPMG personnel who billed time on a Deal knew nonpublic information about the Deal, and it will ask the jury to draw an inference against Avent based on that contention.  But the SEC's contention is wrong, as many people within KPMG who did not bill time to the Deals nevertheless had nonpublic information about the Deals. In addition, Avent is not the only person within KPMG who billed time to all three Deals and who also had

Pirrello is thus probative of whether that other KPMG person could have been the source of the alleged inside information.

documented communications with Garden State.  The inference the SEC will ask the jury to draw, therefore, is unreasonable.

The SEC's inference that Avent tipped Pirrello about the Midas deal is also undermined by the timing of Avent's work on that deal. Avent was not involved in that deal after about February 10, 2012.  After that date, Avent was not copied on emails relating to the transaction.  He did not know whether the Deal was likely to close or not.  Indeed, Avent did not even know that the Deal closed, as he had been on vacation in the week leading up to the announcement and was not paying attention to business news at the time. Any inference that he provided nonpublic information to Pirrello in late February of 2012 is not reasonable.

Moreover, as detailed more fully in the following section, by the time that Avent became involved in the Deals and thus gained nonpublic information about them, Avent and Pirrello's relationship had deteriorated and the two were in conflict.  Avent did not trust Pirrello. Avent had no personal relationship with Pirrello.  And Avent believed Pirrello had defrauded him out of significant amounts of money.  Rather than relating to any of the Deals, the communications between Avent and Pirrello during the timeframe at issue in this action related to the vitriolic dispute between the two and Pirrello's constant efforts to get Avent to invest more money with him to try to recoup his prior losses.  And Avent did not

16

have any interest in providing anything of value to Pirrello at all, much less in risking his livelihood, reputation, and (at least potentially) his freedom to provide valuable information to a broker who he believed had already defrauded him.

Although there were communications between Avent and Pirrello during the times that Avent possessed nonpublic information about the Deals, the SEC is in possession of those communications, and they neither contain any nonpublic information, nor support any inference that nonpublic information was passed. First, Avent communicated often with Pirrello, and there is nothing unusual about the volume or the content of the communications between the two during the times that Avent possessed nonpublic information about the Deals.  There is also a more credible, innocent explanation for the communications than that which the SEC attempts to draw.  And there are also others who possessed the same information about the Deals and had the opportunity to disclose it for gain to Pirrello or another broker at Garden State.

In sum, there is no credible evidence that Avent tipped Pirrello with nonpublic information about any of the Deals, and the SEC's claims fail.

**D. Avent did not receive (or intend to receive) any benefit in exchange for providing any nonpublic information to Pirrello.**

Since he did not tip Pirrello, Avent also did not receive any benefit in any way relating to a supposed tip.  To hold Avent liable, the SEC must prove that

Avent received (or intended to receive) a benefit in exchange for disclosing confidential information.  But Avent never traded in Radiant, Midas, or BrightPoint securities.  Indeed, Avent never profited from his relationship with Pirrello at all.  He lost over $2 million through his relationship with Pirrello.  And Avent had no close, personal relationship with Pirrello.  During the entirety of the period at issue in this action, Avent believed Pirrello to have defrauded him.

The SEC has identified four benefits that it alleges Avent received:  a $50,000 check; help from Pirrello in selling an investment the SEC refers to as the "Cate Street Note"; Pirrello's general investment advice to Avent; and helping Pirrello to create a source of funds by which Pirrello could repay Avent the amounts he owed Avent under the settlement agreement between them.  But to the extent Avent received these things, none were in any way related to the Deals.  Avent did not provide Pirrello with any nonpublic information related to the Deals, let alone any nonpublic information with the expectation that he would receive any of these purported benefits in exchange.  Nor did Avent possess any knowledge that any of these purported benefits were in exchange for information about the Deals.

During the first three quarters of 2011 alone, Pirrello caused more than $500,000 in losses in Avent's account by lying about trades in Avent's account and

by refusing to follow Avent's instructions.  When Avent became aware of Pirrello's misconduct, he contacted Pirrello repeatedly and demanded answers. Those contacts explain the many communications between Avent and Pirrello that occurred in the summer of 2011.  To avoid legal action, Avent and Pirrello ultimately entered into a settlement agreement in which Pirrello agreed to pay Avent $535,000.

On November 15, 2011, Pirrello made a partial payment of $50,000 to Avent under their settlement agreement.  Contrary to the SEC's allegations, that payment was not related to any nonpublic information about the Deals.  Rather, the payment was in partial satisfaction of the contractual obligation that Pirrello owed to Avent under their settlement agreement, and as documented at the time by the settlement agreement and numerous contemporaneous communications (all of which predate the SEC's investigation).  Avent was not motivated to provide any information to Pirrello by the prospect of this partial payment, as Pirrello was already legally obligated to make it.  Moreover, the $50,000 payment amount was less than what Avent typically made in compensation in a single month during this period of his partnership with KPMG.  For that amount, neither Avent nor any other rational actor would be willing to take the risks associated with disclosing nonpublic information to Pirrello.

In October of 2011, when Avent needed funds to satisfy a tax bill, the SEC alleges that Pirrello helped Avent sell the Cate Street Note.  But Cate Street itself arranged the sale.  Any assistance that Pirrello may have provided was not related to any nonpublic information that Avent allegedly provided to Pirrello.  Rather, Pirrello was simply performing his function as Avent's broker—Pirrello had helped place Avent into the Cate Street Note, and it was natural for Avent to work with the same broker in attempting to sell the Note.  In any event, by selling the Cate Street Note in the fall of 2011, Avent forewent about $15,000 dollars in interest that he would have earned just a few months later, and he received instead only face value.  Thus, rather than being a benefit, the sale was a net loss to Avent that he was forced to incur because of Pirrello's malfeasance with the funds in Avent's Garden State account.  Finally, even if whatever investment assistance Pirrello provided could have been a benefit, Avent was not motivated by that benefit to provide any nonpublic information to Pirrello.  Avent had no knowledge that the assistance was in exchange for any information (information that he had not provided), but instead believed the assistance simply to be consistent with Pirrello's obligations as Avent's stockbroker.

Similarly, even setting aside for the moment the fact that Pirrello apparently defrauded Avent repeatedly by "pump and dump" schemes, Pirrello's investment

advice to Avent cannot be described as a "benefit," as that advice resulted in a loss of over $2 million, and, as such, could not (and did not) motivate Avent to provide Pirrello with any nonpublic information.  Because Pirrello was Avent's broker, Pirrello was obligated to provide advice in exchange for the money Pirrello earned as commissions on Avent's trades.

Ultimately, when Pirrello failed to pay any further amounts to Avent under their settlement agreement, Avent hired a law firm to pursue legal action against Pirrello and demanded that Pirrello execute a promissory note in Avent's favor. And when Pirrello failed to pay Avent what he owed under that promissory note, Avent filed suit against Pirrello (as Avent had been threatening to do for years). That lawsuit is still pending.  Contrary to the SEC's allegations, Avent did not provide nonpublic information to Pirrello in order to provide Pirrello with a source of funds to repay him.  Given Pirrello's duplicity and mismanagement of Avent's funds and investments, it is not reasonable to conclude that Avent would risk his reputation, livelihood, and potentially his freedom to help Pirrello fund a repayment obligation that Pirrello was already legally obligated to make.  And even if Avent's hope that Pirrello would comply with his promises to repay him could have been a benefit under the federal securities law, Avent had no knowledge that Pirrello's obligations were in exchange for anything other than the

agreement the two had reached, the promissory note that Pirrello executed in Avent's favor, and Pirrello's existing duties to Avent as his broker.

In sum, Avent did not receive any benefit from Pirrello, was not motivated to provide any information to Pirrello in exchange for any benefit, and had no knowledge that anything that Pirrello provided or promised to provide to him could have been a benefit, as that term is used in insider-trading cases. Thus, Avent did not violate any federal securities laws.

### E. Avent did not breach any fiduciary duty.

Because he did not disclose nonpublic information to Pirrello about any of the Deal targets and did not expect or receive any benefit in exchange for any such disclosure, Avent also did not breach any fiduciary duty. For Avent to be liable as a tipper, the SEC must prove that he violated a duty of confidence. Avent does not dispute that, as a result of his work for KPMG, he undertook certain fiduciary duties with respect to the firm's clients. But for the reasons outlined above, he did not breach any such duty. The SEC's claims against him fail for this reason too.

### F. The SEC's claims fail because Avent did not act with scienter.

For many of the same reasons explained above, the SEC cannot prove that Avent acted with the level of scienter, intent, or knowledge necessary for Avent to be liable for insider trading. Avent never disclosed information that he knew was

material or nonpublic about any of the three Deals, so he could not have acted in a way that knowingly violated a duty of confidence or that he knew could be used by Pirrello to gain an unfair advantage in trading. And Avent was not motivated by a desire to receive any benefit in exchange for providing any alleged nonpublic information because he did not disclose any such information, never received any such benefit, and had no knowledge of any such benefit. Because Avent did not disclose any nonpublic information to Pirrello and had no intent to receive a benefit in exchange, there is no basis upon which to infer that he acted with the mental state required for him to be liable for the violations the SEC has alleged in this action.

## G. Conclusion

Avent did not provide any material nonpublic information relating to any of the Deals to Pirrello or anyone else. No trade occurred as a result of any information that Avent provided, and publicly available information in the market preceding the announcements of the Deals explains the trades that were made. Avent did not benefit nor intend to benefit in exchange for providing any nonpublic information to anyone. He therefore did not act breach any fiduciary duty or act with the level of intent, knowledge, or scienter that the SEC's claims require.

<u>List of Authorities</u>

- 17 C.F.R. § 240.10b-5

- 17 C.F.R. § 240.14e-3

- 15 U.S.C. § 78j(b)

- 15 U.S.C. § 78n(e)

- *Kokesh v. SEC*, 137 S. Ct. 1635 (2017)

- *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)

- *United States v. O'Hagan*, 521 U.S. 642 (1997)

- *Dirks v. S.E.C.*, 463 U.S. 646 (1983).

- *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), *cert. denied*, 136 S. Ct. 242, 193 L. Ed. 2d 133 (2015)

- *S.E.C. v. Obus*, 693 F.3d 276 (2d Cir. 2012)

- *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200 (5th Cir. 2009)

- *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276 (11th Cir. 2007)

- *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956 (11th Cir. 2007)

- *U.S. S.E.C. v. Ginsburg*, 362 F.3d 1292 (11th Cir. 2004)

- *S.E.C. v. Yun*, 327 F.3d 1263 (11th Cir. 2003)

- *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999)

- *S.E.C. v. Adler*, 137 F.3d 1325 (11th Cir. 1998)

- *United States v. Jones*, 29 F.3d 1549 (11th Cir. 1994)

- *Connecticut Nat. Bank v. Fluor Corp.*, 808 F.2d 957 (2d Cir. 1987)

- *S.E.C. v. Carriba Air, Inc.*, 681 F.2d 1318 (11th Cir. 1982)

- *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir. 1974)

- *S.E.C. v. Strebinger*, 114 F. Supp. 3d 1321 (N.D. Ga. 2015)

- *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt.*, 111 F. Supp. 3d 1336 (S.D. Fla. 2015).

- *S.E.C. v. City of Miami, Fla.*, 988 F. Supp. 2d 1343 (S.D. Fla. 2013)

- *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060 (D.N.M. 2013)

- *City of Pontiac Gen. Employees Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267 (N.D. Ga. 2011)

- *S.E.C. v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010)

- *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336 (N.D. Ga. 2010)

- *S.E.C. v. Johnson*, 530 F. Supp. 2d 296 (D.D.C. 2008)

- *In re Coca-Cola Enters. Sec. Litig.*, 510 F. Supp. 2d 1187 (N.D. Ga. 2007)

- *S.E.C. v. Treadway*, 430 F. Supp. 2d 293 (S.D.N.Y. 2006)

- *S.E.C. v. Ballesteros Franco*, 253 F. Supp. 2d 720 (S.D.N.Y. 2003)

- *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291 (S.D. Fla. 2002)

- *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000)

- *Sec. & Exch. Comm'n v. Revolutions Med. Corp.*, No. 1:12-CV-3298-LMM, 2015 WL 11199068 (N.D. Ga. Apr. 3, 2015)

- *U.S. Sec. & Exch. Comm'n v. Melvin*, No. 1:12-CV-2984-CAP, 2013 WL 12062834 (N.D. Ga. June 26, 2013)