IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,  :<br>:<br>Plaintiff, :<br>:<br>v. :<br>:<br>THOMAS W. AVENT, JR.; :<br>RAYMOND J. PIRRELLO, JR.; :<br>:<br>Defendants. : | CIVIL ACTION NO.<br>1:16-CV-2459-SCJ |

## ORDER

This matter appears before the Court on a Motion to Exclude Expert Testimony (Doc. No. [99]) filed by Defendant Raymond J. Pirrello, Jr., and joined by Defendant Thomas Avent, Jr. (Doc. No. [102]).

## I.    BACKGROUND

Avent was a partner at KPMG, LLP in the mergers and acquisitions tax practice. See Doc. No. [1], pp. 5, 8; ¶¶16, 25. Plaintiff alleges that, between June 2011 and June 2012, Avent provided material, non-public information regarding three planned acquisitions to his stock broker—Pirrello. See id. pp. 13, 17—18, 25—26; ¶¶44, 58—60, 78—79. Pirrello then allegedly contacted his friend, Lawrence Penna, and other colleagues and clients who all traded

on the confidential information, reaping hundreds of thousands of dollars in profits. See id. pp. 13, 15−16, 18−19, 24−26, 28; ¶¶44, 49, 54, 61, 71, 74−76, 79, 84−85.

To support its position, Plaintiff plans to offer the testimony of Dr. Matthew Cain, a financial economist. Dr. Cain would testify that the announcements of each of the three mergers and acquisitions (the "M&A announcements") had large, positive, and statistically significant impacts on the stock prices for each of the three companies. Doc. No. [99-2], pp. 6−7, ¶6. Furthermore, he found "no evidence of information leakage prior to any of the three M&A announcement dates." Id. p. 7, ¶7. Based on his review of the trading activity of Penna and other traders connected to Pirrello, Dr. Cain documented how they made short-term trades in the stock of the three companies shortly before and after the M&A announcements, receiving gross return rates of more than 50%. Id. pp. 7−8, ¶¶8−9. Defendants seek to exclude Dr. Cain's expert report and testimony, arguing they "are neither reliable nor relevant." Doc. No. [99-1], p. 4.

2

## II. LEGAL STANDARD

Trial courts serve a critical gate-keeping function concerning the admissibility of expert testimony. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).  Expert testimony can be particularly persuasive, and as such, the role of the trial court is to keep speculative and unreliable testimony from reaching the jury. Daubert, 509 U.S. at 595; McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002). The trial court must examine "the foundations of expert opinions to ensure they meet the standards for admissibility." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (emphasis in original) (citing McCorvey, 298 F.3d at 1257); see also Kumho, 526 U.S. at 147–49, 152.

While the trial court's role is critical, it is not "intended to supplant the adversary system or the role of the jury." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311 (11th Cir. 1999). Where the accuracy of evidence is truly the issue—as opposed to its admissibility—the trial court should allow the judicial process to resolve the matter. Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction

on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." Frazier, 387 F.3d at 1260; see also Allison, 184 F.3d at 1312 (stating that the proponent has the burden to show reliability by a preponderance of the evidence).

### A. Federal Rule of Evidence 702

Federal Rule of Evidence 702 allows a qualified expert to give opinion testimony when it is necessary to help the trier of fact understand the issues, the opinion is based on sufficient facts or data, it was produced using reliable principles and methods, and those principles and methods were reliably applied to the facts of the case. Fed. R. Evid. 702. The Eleventh Circuit employs a "rigorous" three-part inquiry to determine if these admissibility criteria are met. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998). Expert testimony is admissible when:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

4

Id. Thus, the admissibility of an expert's opinion turns on three things: qualifications, reliability, and helpfulness. See Frazier, 387 F.3d at 1260–62.

### 1. *Qualifications*

Experts may be qualified in many ways. Id. at 1260–61. Rule 702 makes clear that expertise can arise from "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Courts must ensure an individual's experience provides an appropriate foundation for asserting the opinions in question. Frazier, 387 F.3d at 1262. Determining that a witness is qualified to form an opinion is a separate and distinct inquiry from whether or not that opinion has a reliable basis. Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). In other words, a witness can be qualified, yet offer unreliable testimony. Id. at 1342.

### 2. *Reliability*

The reliability inquiry focuses on the principles and methodology underlying the expert's opinion, not the expert's conclusions. Daubert, 509 U.S. at 595. The question is not whether the expert's opinion is correct, but whether the basis on which it rests is reliable. Allison, 184 F.3d at 1312. Generally, if the principles, theories, and methodologies behind the opinion

are scientifically valid and can be applied to the facts at issue in the case, then the opinion has a reliable basis. Daubert, 509 U.S. at 592–93.

The Supreme Court discussed four factors in Daubert that a court might consider in its reliability inquiry: whether the methodology has been (or can be) tested, whether the methodology has been subject to peer review, whether the methodology has a high rate of error, and whether or not the methodology is widely accepted within the scientific community. Id. at 593–94. However, this list is not comprehensive. Id. at 593 ("Many factors will bear on the inquiry, and [there is no] definitive checklist or test."). Courts are not limited to the Daubert factors and may consider other questions in light of the specific facts of the case at hand. Kumho, 526 U.S. at 152 ("[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."); Allison, 184 F.3d at 1312 (noting that the factors listed in Daubert were not exhaustive). Courts have considered other factors such as whether an expert relied on "anecdotal evidence (as in case reports), temporal proximity, [or] improper extrapolations (as in animal studies)." Allison, 184 F.3d at 1312.

There is an important distinction between scrutinizing the reliability of an expert opinion's underlying methodology (or principles) and scrutinizing the expert's application of that methodology. Quiet Tech., 326 F.3d at 1343. Challenging the underlying methodology in general is an admissibility issue; challenging the expert's application of that methodology is an accuracy issue. Id. at 1344, 1344 n.11, 1345 (finding no error in the district court's decision to admit expert testimony where the parties agreed that the mathematical equation the expert used was a valid equation, but the plaintiff asserted it was the wrong equation to use). Issues of accuracy are best resolved through cross-examination and the adversarial process. Id. at 1345; see also Daubert, 509 U.S. at 596; Bazemore v. Friday, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility"). Generally, as long as the methodology is "rooted in science" and is "empirically testable," the resulting opinions are admissible. Quiet Tech., 326 F.3d at 1346.

### 3. *Helpfulness*

The helpfulness prong of the inquiry requires that an expert's testimony involve matters beyond the understanding of the average lay person. Frazier,

387 F.3d at 1262. The opinion must also have a "valid scientific connection to the disputed facts in the case." <u>Daubert</u>, 509 U.S. at 591. The expert may be qualified and the basis for his opinion may be reliable, but if his opinion is not necessary for resolving the issues in the case, then the opinion is not relevant and should not be admitted. <u>See id.</u>

### III.   ANALYSIS

As an initial matter, Pirrello never explains his bald assertion that Dr. Cain's testimony is not relevant. <u>See</u> Doc. No. [99-1]. Evidence is relevant if it has "any tendency to make a [consequential] fact more or less probable." Fed. R. Evid. 401. Dr. Cain's testimony that Penna and his family purchased stocks and options of the three target companies "shortly before the M&A announcements and sold immediately afterward" is certainly relevant to whether Penna and his family had insider information about the M&A announcements before they became public. <u>See</u> Doc. No. [99-2], p. 7, ¶8. Likewise, Dr. Cain's testimony that other traders connected to Pirrello "generally took long positions in both stock and options," but took "short-term holding" positions in the target companies shortly before the M&A announcements is relevant to whether they knew insider information. Pirrello

simply does not explain what aspect of Dr. Cain's report is supposedly irrelevant to the issues in this case. See Doc. No. [99-1].

Indeed, the argument section of Pirrello's initial brief does not cite to a single case to support **any** of his arguments. See id. pp. 7—9. The argument section of his reply brief fares little better, failing to cite to any cases from the Eleventh Circuit. Doc. No. [114], pp. 5—11. Because Pirrello's "persuasive authority" fails to persuade—as will be discussed below—the Court relies only on binding authority. Additionally, Pirrello's reply brief challenges, for the first time, the "methodology used by Dr. Cain," asserting that Plaintiff did not demonstrate it "has been tested, has been subjected to peer review and publication, or is generally accepted." Doc. No. [114], p. 4. Pirrello's failure to raise this argument sooner is, in and of itself, fatal. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 682—83 (11th Cir. 2014) (holding that arguments raised for the first time in a reply brief "come too late," and citing five published Eleventh Circuit opinions applying this rule). Moreover, as will be discussed below, he is wrong.

The admissibility of Dr. Cain's opinion turns on three things: qualifications, reliability, and helpfulness. See Frazier, 387 F.3d at 1260–62;

9

Harcros Chems., 158 F.3d at 562. "While Pirrello does not concede or agree regarding [Dr.] Cain's qualifications," neither does he offer any argument that Dr. Cain's qualifications are insufficient. See Doc. No. [114], p. 5. Dr. Cain has a Ph.D. in finance from Purdue University, has taught finance at the University of Notre Dame, and has been published in leading legal, finance, economics, and accounting journals. See Doc. No. [110], pp. 1—2. While not determinative, Dr. Cain has been qualified as an expert in two prior cases, including having provided expert testimony during an insider-trading trial. See id. p. 2. The Court concludes that Plaintiff has met its burden of demonstrating that Dr. Cain is qualified to testify as an expert as to the matters in his report. See Frazier, 387 F.3d at 1262.

As to the third requirement, Pirrello nowhere argues that Dr. Cain's testimony would be unhelpful. See Docs. No. [991-], [114]. As Plaintiff explains, Dr. Cain's testimony will be helpful to the jury in understanding everything from the underlying concepts and terminology at issue in this case to the materiality of the M&A announcements and the nonpublic nature of the information. See Doc. No. [110], p. 15. The Court concludes that Plaintiff has met its burden of demonstrating that Dr. Cain's testimony involves matters

10

beyond the understanding of the average lay person and will be helpful to the jury in resolving the issues in this case. See Daubert, 509 U.S. at 591; Frazier, 387 F.3d at 1262.

Defendants' challenge to Dr. Cain's testimony thus hinges on their argument that he did not employ a reliable methodology for reaching his conclusions. In support of this argument, Defendants' note that Dr. Cain (1) did not include information about other people trading stock options in the three companies around the time of the M&A announcements and (2) did not "include a review of the statements or depositions" of Pirrello's clients and colleagues who engaged in the trades at issue. Doc. No. [99-1], pp. 8—9. What is notably lacking from Defendants' brief is any explanation for how the "failure" to include or consider these facts undermines Dr. Cain's methodology. See id. To be sure, Plaintiff bears the burden of demonstrating that Dr. Cain's methodology is reliable. Frazier, 387 F.3d at 1260; Allison, 184 F.3d at 1312. But, for the reasons discussed below, it has met that burden and Defendants' arguments fail to persuade the Court otherwise.

Dr. Cain's report clearly explains the methodology he employed in determining if the M&A announcements had a statistically significant impact

11

on the stock prices of the companies. Doc. No. [99-2], pp. 11–12, ¶¶16–19. It also explains his methodology for determining that the material information did not leak ahead of the M&A announcements (id. pp. 14–16, ¶28), and how he calculated trading profits (id. pp. 29–30, ¶¶64–66). The Eleventh Circuit has acknowledged that event studies, like those Dr. Cain conducted, are "used routinely in the academic literature to determine whether the release of particular information has a significant effect on a company's stock price." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1313 (11th Cir. 2011).[1] The very event-study methodology used by Dr. Cain has been used in insider trading cases for years, as recognized in the academic literature. See Doc. No. [110-2].

Defendants do not cite to a case or academic publication addressing the kind of methodology employed by Dr. Cain in this case. See Docs. No. [99-1], [114]. Indeed, most of the cases cited by Defendants' have nothing to do with insider-trading. See Doc. No. [114], pp. 5–11. One of the cases they cite was

---

[1] Pirrello argues this case is inapplicable because the Eleventh Circuit was not considering a Daubert challenge. Doc. No. [114], pp. 4–5 n.2. Regardless of whether the Eleventh Circuit was considering a Daubert challenge or not, the fact remains that it recognized event studies are routinely used in academic publications in the very manner Dr. Cain used them in this case. FindWhat, 658 F.3d at 1313.

actually **overruled** for improperly ignoring expert statistical opinion because the parties' disputes "went to the weight of the evidence each was presenting, not to its admissibility." See Adams v. Ameritech Servs., Inc., 231 F.3d 414, 428 (7th Cir. 2000); see also Doc. No. [114], p. 8. The only insider-trading case cited by Defendants is wildly different from the one at bar and actually cuts against Defendants' arguments.

The "methodology" employed by the expert at issue in S.E.C. v. Lipson, 46 F. Supp. 2d 758 (N.D. Ill. 1998) bears no resemblance to the methodology used by Dr. Cain in this case. See 46 F. Supp. 2d at 766–69. What's more, the Lipson Court excluded that expert's opinion, in part, because he relied on "the subjective statements of an interested party about what he believed," making his methodology thoroughly flawed. Id. at 767. But that is the very kind of evidence Defendants' criticize Dr. Cain for not considering. They want Dr. Cain to "include a review of the statements or depositions" of Pirrello's clients and colleagues who engaged in the trades at issue. Doc. No. [99-1], pp. 8–9. Considering such self-serving, subjective statements would only serve to make Dr. Cain's methodology **less** reliable, not more.

Defendants' contention that Dr. Cain should have "conduct[ed] an analysis of any other trades executed with potential insider information" is equally unpersuasive. See Doc. No. [99-1], p. 8. This case is about whether Defendants' committed insider trading, not whether some other unspecified individuals might also have committed insider trading. Indeed, Defendants' entire motion seems to be based on the mistaken belief that Dr. Cain rendered an "opinion that there must have been insider trading." See Doc. No. [99-1], p. 9. In fact, Dr. Cain's actual report makes no such conclusion and doesn't even mention "insider trading." See Doc. No. [99-2], pp. 5—32.

Because Dr. Cain did not make any conclusions about the motives of Pirrello or the people he allegedly gave insider information, "a review of the statements or depositions" was irrelevant to his analysis, and his decision not to consider the statements does not undermine his methodology. Dr. Cain's event studies were based on the performance of the three companies' stock relative to the entire industry/market. See, e.g., Doc. No. [99-2], p. 45. A specific analysis of "options trading" for the companies would have been irrelevant to the questions Dr. Cain was asked to answer. See Doc. No. [99-1], p. 8. Defendants' nowhere explain how such an analysis would have

14

impacted Dr. Cain's conclusions, or why a "failure" to include the analysis undermines any of his conclusions. See Docs. No. [99-1], [114].

Defendants simply ignore the important distinction between scrutinizing the reliability of Dr. Cain's underlying methodology and scrutinizing his application of that methodology. See Quiet Tech., 326 F.3d at 1343. Their arguments that he "fail[ed] to include [certain] variables" in his analysis go to the weight of the evidence, "not its admissibility." Bazemore, 478 U.S. at 400. Because Dr. Cain's methodology is "rooted in science" and is "empirically testable," the resulting opinions are admissible. Quiet Tech., 326 F.3d at 1346.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude (Doc. No. [99]) is **DENIED**.

**IT IS SO ORDERED,** this 15th day of March, 2018.

s/Steve C. Jones
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE