FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 1 9 2018

JAMES N. HATTEN, Clerk
By: ⟨signature⟩ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

      v.

THOMAS W. AVENT, Jr., and
RAYMOND J. PIRRELLO, Jr.

      Defendants.

Case No. 1:16-cv-02459-SCJ

## DEFENDANT THOMAS W. AVENT, JR.'s
## REPLY BRIEF TO PLAINTIFF'S MOTION *IN LIMINE*
## TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING
## DEFENDANT'S PERSONAL AND PROFESSIONAL HARDSHIP

Defendant Thomas W. Avent, Jr. ("Avent") respectfully files this Reply

Brief in response to Plaintiff's Motion *In Limine* to request that this Court enter an

order before trial barring me from arguing that: (1) the filing of this case has

caused me to suffer personal, financial or professional hardship; and, (2) a finding

of liability against me could cause me to suffer additional personal, financial or

professional harm. Plaintiff is apparently concerned that a jury might look at the

devastation caused by its reckless actions in this case and decline to vote for

further punishment. Once again, as was the case when the SEC filed a brief

opposing my discovery requests against KPMG, Plaintiff wants to obfuscate the truth by presenting to the jury a very distorted picture of this defendant in hope that the jury will not focus on Plaintiff's gross misuse of power to maim and destroy lives without a shred of accountability. For the reasons explained below, the Court should deny Plaintiff's Motion.

## BACKGROUND

Plaintiff alleges that, in 2011-2012, I tipped Raymond J. Pirrello Jr. ("Pirrello") about three deals I learned about while employed at KPMG, and that Pirrello subsequently relayed such information to certain persons unknown to me who traded the stocks of such companies. The immediate question is why would I risk my career and even possibly my freedom to tip a man I had never met and who I believed had effectively stolen a large amount of money from me? I cannot answer that question, because the truth is I never tipped anyone, I know nothing about any trading in the stock of the three companies at issue and I have never profited from disclosing confidential information.

To believe the SEC's allegations in this case, one must first believe that everyone at KPMG, except me, is telling the truth and that I am lying about

2

everything. Nothing could be further from the truth and at trial I will show that KPMG has made a series of misrepresentations to the SEC. Moreover, to believe Plaintiff's allegations, one must also believe that the entire dispute between Pirrello and myself was manufactured in 2011-2012, far before Plaintiff commenced its investigation, to cover up an insider trading scam. At trial, I will prove that (1) the dispute between Pirrello and myself was very real; (2) Pirrello treated my money as his own and continually misrepresented the state of my account; (3) upon discovering Pirrello's mishandling of my account, I threatened to sue him and only desisted after he promised to repay the money I invested with him in 2011; (4) Pirrello, trading on his own, lost all the money in my account, and defaulted on his promise to repay $535,000; and (5) the $50,000 payment Plaintiff alleges was made for tipping inside informationI was, in fact, Pirrello's one and only payment on the $535,000 loan he promised to repay by September 30, 2011, for mishandling my money and had absolutely nothing to do with any insider trading.

In point of fact, not only was the $50,000 payment I received in November 2011 not for tipping inside information, but because (1) my account at Garden State still contained approximately $250,000 in securities when in July 2011 Pirrello and I agreed to treat the amount invested in 2011 as a loan from me to him

and I had nothing to do with the losses in the account after that point, and (2) the

$50,000 payment was the only payment Pirrello ever made on his promise to pay

me $535,000, the payment of $50,000 actually representing the closing of an

additional loss of approximately $200,000 during the time of the transactions in

question. I think the importance of that crucial point cannot be overstated. One of

the critical legs of Plaintiff's Case is its allegation that the $50,000 payment I

received in November 2011 was related to tipping inside information. But a close

look at the facts illustrates the absurdity of Plaintiff's allegations.

The dispute between Pirrello and I over his mishandling of the account

blew up in early July 2011 when I discovered that he had lied to me about the

account and that I had suffered losses of over $200,000 related to an investment he

represented he had sold in Bank of America. From that point on, there were

numerous angry calls and e-mails from me directed at Pirrello, as I considered his

activities with respect to my account to be criminal. Pirrello continually pleaded

with me not to take legal action and offered to repay the $535,000 I had invested

with him ($855,000 initially invested, less $70,000 withdrawn, less $250,000

invested in the Cate Street Note). E-Mails between Pirrello and I document that, on

no later than July 11, 2011, Pirrello and I had agreed that he would repay the

$535,000 I had given him in return for me not pursuing legal action against him. In

return for his promise to repay the $535,000, I agreed that the amount remaining in my account as of that date was actually Pirrello's money. Notably, said agreement was contemporaneous in time with when Plaintiff alleged I tipped Pirrello on the NCR Radiant transaction. Putting aside the absurdity that I would be threatening to take legal action against someone at the same time I tipped inside information, my account at Garden State at that time still contained securities worth approximately $250,000 (per Garden State account statement, the balance in the account as of June 30, 2011 was $270,563.10, while the value of the account had declined to $214,002.40 by July 31, 2011).

Obviously, nobody would be threatening to take legal action against someone and at the same time conspire to break the law with them. So to believe Plaintiff's allegations that I tipped Pirrello on the NCR Radiant transaction, one must also believe that the entire dispute between Pirrello and I was manufactured to cover up insider trading. The idea is so ludicrous and farcical that I still cannot believe Plaintiff's Complaint was judged sufficient to avoid an order of dismissal. After all, pursuant to our agreement, which admittedly turned out very unfavorably for me, I gave Pirrello approximately $250,000 (again this is an estimate, based on the account statements referenced above, but the agreement was reached early in July when the account value was higher than later in the month). In return for my

giving Pirrello $250,000, he promised to repay $535,000 no later than September 30, 2011. Following our agreement, Pirrello treated the money in the account as his own and made no attempt to discuss purchases and sales with me. The only restriction I placed on him was that he not buy anything on the KPMG restricted list, which he could access and did follow.

So under Plaintiff's theory of the case, the dispute between Pirrello and I was manufactured to cover up insider trading. But if I had closed my account on July 11, 2011, the date that the NCR Radiant deal was announced, I would have walked away with approximately $250,000, plus ownership of the Cate Street Note. Instead, I received a single payment of $50,000 in November 2011. So if you believe Plaintiff's allegations, I paid Pirrello approximately $200,000 in return for him receiving my alleged tips. I realize that's crazy, but it is what Plaintiff has alleged in this case if you take a deep dive into the actual facts.

Another problem with Plaintiff's case is that if you assume that the $50,000 payment related to insider trading, which, of course, it did not, what was the source of such payment? While I have never engaged in insider trading, I would assume that the tipper would generally receive some portion of the money made by the tippee as a result of such tip. There is no allegation that I even knew of the existence of Pena or anyone else who supposedly traded in the stocks at issue. So

the only payment to me would have had to originate from Pirrello, a man I did not know personally, although we did have customer relationship. According to Plaintiff's Complaint, Pirrello received a $7,500 payment on his credit card from profits realized from trading Radiant stock. So if Pirrello and I were sharing profits, presumably I would have received some portion of that $7,500. But Plaintiff alleges in its Complaint that Pirrello then paid me $50,000 for insider information. The obvious question is how does Pirrello get $50,000 from $7,500? Of course, the obvious answer is he does not, the $50,000 payment had nothing to do with insider information. That fact is backed up by (1) contemporaneous documentation, (2) the timing, which was in November four month after the NCR Radiant transaction, and (3) the fact that I made no attempt to hide it and volunteered information about the payment to the FBI.

Now Pirrello may have tried to conceal the payment to hide the fact that he entered into a private settlement with a client to avoid litigation, but I never tried to conceal such payment because there was nothing wrong with it from my standpoint; it was simply an installment payment on a loan to Pirrello. Any assertion that the $50,000 payment related to insider trading was just made to string together a circumstantial case and has absolutely no basis in reality. As detailed above, I had a basis in the loan arrangement of $250,000, which was the

amount I gave Pirrello control over in exchange for his promise to repay $535,000.

That $250,000 transfer was made in early July 2016. Unfortunately for me,  the

50,000 payment I received from Pirrello in November 2011 was the only amount I

ever received from the $250,000 I gave Pirrello in July 2011, so the loan

arrangement turned out to be a $200,000 loss. There was no enrichment to me

whatsoever, it was just more money down the drain.

Plaintiff's allegation that I also received a benefit in the form of help

selling an illiquid note is still a head scratcher to me as well. Pirrello put me into

the Cate Street Note (the "Note"). I paid $250,000 for it and I received $250,000

for it when I sold it. The Note was purchased roughly six months before the NCR

Radiant transaction and was sold several months after the Brightpoint transaction. I

really knew nothing about the marketability of the Note when I bought or sold it. It

was just one of the only investments I ever made with Pirrello where I did not lose

100% of my money.  But the Note was paying interest currently and, as far as I

knew, was worth far more than face, at least that is what I was told by Pirrello,

which is confirmed in our written correspondence.

If Pirrello had repaid his loan I would have never sold the Note. I did not

believe at the time that I was receiving anything of value for the Note, in fact, I

thought I was selling it at a loss. Why would I enter into an insider trading

arrangement so that I could buy a note just to sell it at cost? And who other than the person who arranged the purchase of the Note note for my account, Pirrello, would I approach about selling it?

I am really not sure how much Pirrello did to find a buyer for the Note, it was my impression at the time that the buyer was an investor in Cate Street and was located by them. The sale was facilitated by Cate Street and I did not know the buyer. I know now that Plaintiff alleges the buyer traded in some of the stocks at issue in this case. If there was anything improper about his purchase of the Note, why did Plaintiff not sue him in this action? And if Cate Street was a party, why are they not also a defendant? All I know is that the money did not come from Pirrello and, as far as I know, his involvement was nothing more than what a broker normally does for a client. If he buys Bank or America stock for my account and then sells it, am I receiving a benefit when he sells it? There was no profit on the transaction and I believed I was selling the note at less than fair market value.

Perhaps this is another situation similar to the movie, Vegas Vacation, where Chevy Chase is gambling at the Blackjack table and losing every hand. But then on one hand he ties the dealer and does not lose his money and the dealer becomes angry. It seems the SEC in this case is like that dealer in Las Vegas and is

angry that I did not lose all my money in one investment.

Thus, a central problem with the SEC's entire case is there were no profits, at least not to me, and the contemporaneous evidence belies their allegations that I received anything for disclosing confidential information. To the contrary, not only did I not tip anyone, but I lost $485,000 in the stock market in 2011-2012 because of unauthorized trading by Mr Pirrello. That $485,000 is net of the alleged benefits I received, neither of which had anything to do with compensation for confidential information, a point I will prove at trial through contemporaneous documentation. From my standpoint, there were no profits to disgorge, just massive losses.

Over the course of my relationship with Pirrello, I realized financial losses of approximately $2.3 million, having been victimized by a series of what were most likely pump and dump scams. That I realized such significant losses in a rising stock market, at a time when I had confidential information on approximately two hundred companies, is certainly at odds with the allegations made by the SEC in this case. In point of fact, the weightiness of such circumstantial evidence against any inference that I would misuse confidential information should more than refute the SEC's purported circumstantial evidence that I was involved in insider trading. Indeed, nothing about my long professional

career in the M&A area and the $3 million of stock losses I suffered from investing in the market throughout my life is consistent with a person who would misuse confidential information for his own personal enrichment. In truth, I would have never considered doing what the SEC has alleged, even for $100 million in a Swiss bank account, which is why I find my inclusion in this case so grievous. I may be a fool who is easily parted from my money, but I am not a liar and I I know absolutely nothing about insider trading in this case.

But while the SEC's allegations with respect to me are blatantly untrue, the mere filing of this lawsuit has damaged my life far more than the penalties sought by the SEC. Shortly after this lawsuit was filed in July 2016, I was fired by KPMG just two months before my scheduled retirement. The firm refused to pay the remainder of my contract and terminated me without severance. The Firm also cancelled all ceremonies planned to honor my long career at KPMG and ordered everyone at the Firm to have no contact with me at the threat of their own futures at KPMG. KPMG took all those actions even though they conducted no investigation and never even talked to me about the SEC matter.

The termination without severance cost me approximately $1.3 million. Moreover, the publicity surrounding this suit caused me to lose all offers of employment I had commencing October 2016, costing me at least $1.5 million

more from October 2016 until today. Additionally, in response to the SEC's investigation, I incurred over $1.5 million in legal expenses. To pay my lawyers, I have had to borrow $1 million from hometown banks in Oxford, Mississippi, which loans had to be guaranteed by family members since I am unemployed. Thus, I have already paid the equivalent of a $4.3 million fine, even though I have never had my day in Court.

Not only have I been unemployed since this lawsuit was filed, but because of my age and the period of time I have now been unemployed, my professional career is effectively over. It seems that about the only thing I would now be considered qualified to do at my age is run for President. Accordingly, not only did the lawsuit cost me $4.3 million and counting, but it also served as a lifetime suspension from the career in which I practiced for almost 40 years.

In addition to the steep monetary and professional penalties I suffered as a result of this lawsuit, I have been isolated from almost all of the people I saw on a daily basis for years. I now live a solitary life focused almost entirely on my son and my two dogs, who are virtually my only companions. The isolation has taken a steep toll on both my physical and mental health. I have endured a series of cancer scares commencing the month this lawsuit was filed and almost died of sepsis in September 2016. Even today I still have to see a dermatologist every

month because my hair keeps falling out due to the stress from being sued by Plaintiff.

Indeed, the fact that this lawsuit is still ongoing after the financial, professional and personal damages I have already suffered seems tantamount to cruel and unusual punishment. After working all my life, I now find myself 66 years old, unemployed, and burdened with $2 million of debt that I have no current means to repay. I have no career prospects and, because of the huge stress this lawsuit has triggered, I undoubtedly have already lost years off my life.

But perhaps the most disturbing aspect of this case is being publicly labeled a liar. I started working at the age of 12 loading and unloaded crates of milk. By 16, I was driving a delivery truck every day and during college  I waited tables. I earned four college degrees and worked very hard all my life to (1) build my professional reputation, (2) mentor younger professionals and (3) give back to charities, primarily my alma mater to which I have donated throughout my life. In April 2016, I was inducted into the University of Mississippi Accounting Hall of Fame for a lifetime of giving back. But this lawsuit has destroyed my reputation and legacy and has thwarted my hopes to spend my final years teaching accounting courses and fundraising for my alma mater.

In short, the SEC has already taken everything I have, as my lifetime of work

was erased with the filing of this lawsuit. In many ways, I feel the SEC here is analogous to the cop who shoots a fleeing suspect in the back because he was late on his child support payments. As in that case, the punishment I have endured is grossly disproportionate to the charged offense, even if I had done everything the SEC alleges. The fact that I am 100% innocent just makes such punishment that much more unjust.

In truth, I am now struggling to comprehend why this case matters since it clearly is not about recovering money. In point of fact, the Government lost a far greater sum than this case involves when the SEC made sure that I would never work again, transforming me from an active wage earner who paid hundreds of thousands in taxes each year to someone who is unemployed and a burden on society. Neither is this case about estopping me from illegal trading, as I am not now nor have I ever been a stockbroker. I also no longer work in any job where I have access to confidential information and will never be in such position again. Moreover, I have never made any money trading stocks, I own no stocks currently and I have not had an active stock account since 2016.

Indeed, because of the publicity surrounding this lawsuit, the ultimate outcome of this litigation is probably irrelevant, as while the truth has never been adjudicated, in the court of public opinion, I have already been judged guilty and

punished far more severely than the relief sought by the SEC. And even though I

know nothing about insider trading in the three companies and have cooperated

fully throughout the investigation, clearing my name can never get back what the

SEC has already taken from me.

## **ARGUMENT**

It is the facts set forth above, that (1) I am unemployed and now

unemployable because of this lawsuit, (2) I have borrowed $1 million to fund my

defense and I am pro se only because I have exhausted my borrowing ability, and

(3) I have suffered immense mental and physical distress by virtue of this lawsuit,

which Plaintiff now seeks to insure that the jury never hears. In short, Plaintiff

wants to have its cake and eat it too. It went out of the way to publicize the fact

that it had brought charges against a senior KPMG partner, but they do not want

the jury to know how much their charges have forever altered my life, less a jury

feel that the punishment exceeds the charged offense.

Honestly, I do not blame Plaintiff for wanting to hide the truth, the fact that a

gigantic governmental agency can destroy citizens' lives based solely on weak

circumstantial evidence with no fear of accountability should be frightening to

anyone. But I believe Plaintiff opened the door to such evidence in its initial

pleadings and can not now try to hide the truth by relying on Rule 143.

I think it is indisputable that I was included in this case solely because I was once a partner at KPMG LLP. After all, I never traded in the stocks of any of the companies in question and nowhere is it alleged that I even knew anyone who traded in such securities. In the first paragraph of its Complaint, Plaintiff states that Defendant Thomas W Avent, Jr. is a tax partner with one of the world's largest accounting firms. In other words, Mr Avent is a fat cat and we just caught a big fish.

The Complaint places my name first, even though the defendants are not listed alphabetically, because they knew that snagging a partner in a "Big Four" Firm would attract the most publicity possible. Indeed, even though it is nowhere alleged that I knew anyone who traded the stocks in question, in the newspaper articles based on the press releases issued by the SEC, the lead story was always that a senior KPMG partner took $50,000 for tipping inside information. While the allegation is untrue, it served to grab far more publicity than a case just against the other two defendants.

It was not necessary to identify me as a senior partner in one of the world's largest accounting firms to bring this action. My position as a partner was not relevant to my having confidential information. Indeed, the managers and staff

who worked on such matters spent far more time on such transactions than I did and many others at KPMG were far closer to the clients and knew more about the details of each deal. I had no prior relationship to any of the clients in this case and spent a very limited amount of time on each transaction. The inclusion of such information served only one purpose, to designate me as a highly compensated individual, thereby making this case more worthy of publicity.

The truth is not so sexy. Not only was I a retiring partner at KPMG, but the allegations in the Compliant were 4-5 years old when this suit was brought. Plaintiff alleges in Paragraphs 11 and 12 of its Complaint that Pirrello and I would continue to engage in transactions, acts, practices and courses of business, which violate §10(b) and §14(e) of the Exchange Act, if not enjoined. But the SEC has made no allegations of any such violations in the four years between the Brightpoint acquisition and the filing of this lawsuit. Moreover, I am no longer employed, much less in a position to violate any provisions of the Exchange Act.

Information about my current employment and financial condition is relevant to give the jury an accurate position of my place in life so that they can judge me honestly without any misconceptions. Plaintiff's assertion in its Complaint that I am a senior partner with one of the world's largest accounting firms might very well cause some members of the jury to think that I am rich and,

therefor, not entitled to the benefit of doubt they might give to a person who was less fortunate. And Plaintiff's assertion that I must be enjoined from violating provisions of the Exchange Act may give the jury the false impression that I am still working in the industry and have access to confidential information.

Since Plaintiff has referenced that I was senior partner in one of the world's largest accounting firms, thereby raising the presumption that I am a fat cat, it is only fair that the jury receives a more balanced picture and be informed that I am heavily in debt because of this lawsuit. Similarly, Plaintiff's assertion that I must be enjoined to prevent me from violating the Exchange Act raises the presumption that I still have a career and means to violate the Exchange Act. It is therefor only fair that the jury be told that I have been unemployed for more than two years and that I am living on a pension.

All I am asking here is the opportunity to present the truth, which Plaintiff for good reason wants to hide from the jury. Because of this lawsuit, I am unemployed and deeply in debt. That information hopefully serves to balance the allegations by Plaintiff that I am a fat cat who needs to be enjoined or I will continue to violate the Exchange Act. Some jurors may still feel I got what is coming to me because I was once successful, while others may feel some sympathy for me for all the horrors I have endured at the hands of Plaintiff. But

18

presenting my former position and alleging I must be enjoined without balancing the presentation by also informing the jurors of my current state in life would unfairly prejudice some jurors against me. I am no longer a senior partner at KPMG and I have no means to violate the Exchange Act, as I am unemployed and have been for years.

I also believe that it is necessary to present some evidence of my personal and professional hardships for the jury to understand why I am pro se in this proceeding. Plaintiff has repeatedly noted in its filings that I am an attorney. Consequently, the jury might believe that I am arrogant fool who feels I can represent myself in this proceeding without the aid of counsel. While I did attend law school 40 years ago, I am not, nor have I ever been, a member of the Georgia Bar. Moreover,  I have never tried a case in my life. I fully realize that representing myself in this type of proceeding is not advisable. Indeed, Magistrate Judge Anand said so himself in our mediation conference on August 21, 2018. Since this case is entirely circumstantial and the resolution will ultimately depend on whether the jury believes I am an honest person, for the jury to get an accurate picture of me as a person, they need to know that my being pro se in this case is not a trial strategy, but rather was done out of necessity because of the cost of defending this lawsuit with representation.

In sum, Plaintiff is incorrect in its assertion that evidence of my hardships is completely irrelevant. Plaintiff made such evidence relevant by emphasizing that I was a senior partner in one of the world's largest accounting firms and the necessity of enjoining me from violating the Exchange Act. The truth is that I am unemployed and deeply in debt and such evidence would hopefully allow the jury to just judge the facts rather than harboring any misconceptions emanating from Plaintiff's court filings and press releases that I am a fat cat who is a risk to violate the Exchange Act in the future if not enjoined.

## CONCLUSION

For all the foregoing reasons, I respectfully request that this Court deny Plaintiff's request to bar me from submitting any evidence at trial of the personal, financial or professional hardships I have suffered as a result of the filing of this case or may suffer from a finding of liability in this case.

Respectfully submitted this 19th day of September, 2018.

/s/ Thomas W. Avent Jr.
Thomas W. Avent Jr.
601 Sweetgum Lane
Oxford, MS 38655
(770) 335-0476

20

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2018, I caused copies of the foregoing document to be served on counsel of record by sending it by e-mail and federal express to:


Robert Moye (MoyeR@sec.gov)
Senior Trial Counsel
U.S. Securities and Exchange Commission
Chicago Regional Office
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois 60604


-and-


Christopher Albanese (calalbanese@gusraekaplan.com)
Gusrae Kaplan & Nusbaum PLLC
140 Wall Street
New York, New York 10005


                                        /s/ Thomas W. Avent Jr.
                                        Thomas W. Avent Jr.
                                        601 Sweetgum Lane
                                        Oxford, MS 38655